Filed 10/12/17

CERTIFIED FOR PARTIAL PUBLICATION[*]


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| MAXINE STEWART, as Personal Representative, etc.,[†]<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,<br><br>        Respondent;<br><br>ST. JOSEPH'S HEALTH et al.,<br><br>        Real Parties in Interest. | E067316<br><br>(Super.Ct.No. CIVVS1205737)<br><br>OPINION |

---

[*]  Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 2 and 3.

[†]  Petitioner, Maxine Stewart, brings causes of action as the personal representative of an estate. Previous orders we issued in this case indicated that Bettina Gray, Jordon Carter, Paul Carter, and Regina Carter were also petitioners, as they are plaintiffs alongside Stewart in the trial court action. Upon further review, it appears Gray and the Carters assert a single cause of action for wrongful death, which was unaffected by the summary adjudication order the petition asks us to review. Consequently, they should not be parties to this petition. We have amended the caption accordingly.

ORIGINAL PROCEEDING; petition for writ of mandate. Michael A. Sachs, Judge. Petition granted.

McMahan Law, Carl A. McMahan and Mark J. Habeeb for Petitioner.

No appearance for Respondent.

Brobeck, West, Borges, Rosa & Douville, Louise M. Douville and Edward J. Reid for Real Parties in Interest.

The petition in this case challenges a trial court order summarily adjudicating a cause of action under the Elder Abuse and Dependent Adult Civil Protection Act (the Act), a cause of action for fraud by concealment, and another for medical battery, while allowing other claims, including one for medical negligence, to proceed to trial. Stewart is the representative of Anthony Carter, a man who died after admission to a hospital owned by real parties in interest. She alleges the hospital "denied and withheld from Mr. Carter the right to refuse an unnecessary surgery, denied and withheld from Mr. Carter the right to be involved in secret hospital meetings to invalidate his designated consent, and denied and withheld from Mr. Carter his right to a second opinion prior to proceeding with an unwarranted surgery that resulted in a hypoxic injury, brain damage, cardiac arrest and his untimely death." Having concluded the petition might have merit, we stayed the action in the trial court and requested an informal response. Having received and read the "return by verified answer" that was filed by real parties in interest, we then

2

set an order to show cause and requested further briefing on a specific issue.[1]  Real

parties in interest decided to stand on their informal response in lieu of filing another

brief, and Stewart declined to file a traverse.

We now explain why we conclude we must grant the petition.  Furthermore, we

find it important to emphasize that elders have the right to autonomy in the medical

decision-making process.  We therefore publish the portion of this opinion that discusses

the cause of action for elder abuse to explain how, in our view, a substantial impairment

of this right can constitute actionable "neglect" of an elder within the meaning of both the

little-invoked catchall definition contained in Welfare and Institutions Code

section 15610.57, subdivision (a)(1), and two of the types of neglect that are set forth in

Welfare and Institutions Code section 15610.57, subdivision (a)(2).

PETITIONER'S ALLEGATIONS

The operative pleading alleges the following:[2]  Real parties in interest[3] own and

operate a hospital called St. Mary Medical Center.  On February 1, 2012, Carter, who was

---

[1]  Our order directed the parties to "specifically . . . address the applicability of
*Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 161 (*Winn*), in light of the
fact that Carter appears to have been a patient in a facility owned by real parties in
interest."

[2]  We omit allegations that are unnecessary to the resolution of this petition,
including allegations pertaining to the wound care provided to Carter.

[3]  Real parties in interest are St. Mary Medical Center, St. Joseph Health System,
and David O'Brien, M.D.  For ease of reference, we refer to these parties collectively as
"St. Mary."  We mean no disrespect.

3

78 years old and experiencing confusion, became a patient at St. Mary. He named Stewart, who was at all relevant times a registered nurse with an active license, his durable power of attorney for health care decisions during this admission.[4]

Timothy A. Denton, M.D., one of St. Mary's codefendants, told Stewart two days after Carter's admission that she should consider placing Carter in hospice care, as well as inserting a gastronomy tube (g-tube). Stewart objected, and Dr. Denton agreed to order a calorie count instead of a g-tube.

Some of the defendants, including real parties in interest, planned to perform surgery and implant a pacemaker in Carter, in part because he was experiencing four-second gaps in his heartbeat. On February 7, 2012, Stewart canceled a pacemaker procedure and told real parties in interest she thought the four-second pauses were related to Carter's sleep apnea. She requested a second opinion regarding Carter's need for a pacemaker and opined that he had never previously shown " 'clear indicators' " that he needed one.

Also on February 7, 2012, Dr. Denton, real parties in interest, and others told Stewart that Carter required a g-tube because he was not receiving adequate calories. Petitioner asked them to try parenteral nutrition (TPN) instead of a g-tube, but they "refused to consider and/or abide by this request."

On February 17, 2012, real parties in interest and the other defendants informed Stewart that a pacemaker procedure was scheduled for the following day. Stewart "stated

---

[4] Carter's capacity to execute the power of attorney is not at issue in this proceeding.

4

that she would absolutely not consent to such a procedure" and again requested a second opinion.

The next day, real parties in interest and some of the other defendants, including Dr. Denton, determined through St. Mary's risk management department that they could continue with the pacemaker procedure despite petitioner's objection. Stewart had at no time consented to this procedure and had instead expressly objected to it.

On February 22, 2012, Stewart contacted St. Mary to inquire about Carter and learned he had not had breakfast because he was scheduled for surgery. Stewart again objected to the pacemaker procedure. When Stewart arrived at St. Mary at approximately noon, she was informed the surgery had occurred at 8:30 that morning. Stewart met with several of real parties in interest's representatives, who told her they had proceeded without her consent because she was not acting in Carter's best interests.

Carter went into cardiac arrest sometime on or about February 22, 2012. On information and belief, this occurred because Carter did not need the pacemaker. The pacemaker was surgically removed on February 24, 2012. Carter, who had experienced brain damage, required acute skilled nursing care until his death on April 15, 2013.

PROCEDURAL BACKGROUND

Stewart named St. Mary, Dr. Denton, and others on several causes of action in the operative pleading. St. Mary moved for summary adjudication of most of these causes of action. As relevant to this petition, it argued the elder abuse claim failed because holding an ethics committee meeting about Stewart's power of attorney over Carter could not

5

amount to reckless neglect within the meaning of the Act. The fraudulent concealment claim, St. Mary contended, failed because a hospital owes no fiduciary duty to a patient, and the medical battery claim was allegedly insufficient because the hospital itself did not perform the surgery and the doctors who performed the surgery were not hospital employees.

For evidentiary support for these assertions, St. Mary largely relied on a declaration from Mary Ransbury, R.N., a licensed registered nurse and wound care specialist; we discuss this declaration *post*. Using the testimony of various deponents, including Dr. Denton, St. Mary also established the following background facts and occurrences:

Dr. Denton thought a pacemaker "was clearly indicated" for Carter due to "long [cardiac] pauses" requiring intervention by a specialist. Dr. Denton therefore referred Carter to another codefendant, Ramin Ashtiani, M.D., who eventually made the decision to implant the pacemaker and then actually performed the pacemaker surgery.

When Stewart refused to consent to a pacemaker procedure, Dr. Denton asked St. Mary's risk management department for a consultation regarding concerns he had about Carter's power of attorney. The risk management department decided to convene an ethics committee meeting. Dr. Denton, who participated in the meeting by phone, "stressed the patient could die" if he did not receive a pacemaker and said he did not feel Stewart was acting in his best interests because Dr. Denton knew Carter would "want everything done to save his life." There was a suspicion "that there might be a conflict

6

with Ms. Stewart." After a meeting on a Friday afternoon, an "action plan" was reached that "the power of attorney was valid." However, the committee also concluded that Stewart could be voided as Carter's designee if she failed to authorize lifesaving measures, because "the language of the power of attorney stated, in essence, that all measures were to be taken to preserve [Carter's] life." At some point in time after the meeting, Stewart was in fact voided as the designee of Carter's power of attorney. At his deposition, Dr. Denton admitted he did not consult with any doctor other than Dr. Ashtiani about Carter's pacemaker procedure. Instead, he contacted St. Mary's risk management department and said something like, "Please help me with this case. There are lots of legal issues going on. There is a power of attorney that I think is problematic, and I don't have a clue what to do about this."

Dr. Denton described the ethics committee's role in the surgery as follows: "[W]hat happens is that I provide risk management with information and they make a decision about what to do. [¶] . . . [¶] For example, since I don't implant pacemakers, they will say 'Go ahead. The pacemaker is indicated. It's okay to do that.' And then the pacemaker can be done by the person doing the procedure." For his part, Dr. Ashtiani, when asked if the risk management department "gave [him] the green light" to perform the pacemaker surgery, responded, "If medically necessary, from paper standpoint, we are okay to do that."

In conjunction with its argument regarding the cause of action for medical battery, St. Mary also offered an admission form showing Carter had signed his name next to an

advisement that all "Physicians and Surgeons furnishing services to the patient . . . are independent contractors and are **not** employees of the hospital." St. Mary otherwise relied on discovery responses and the aforementioned Ransbury declaration.

The bulk of this declaration addressed allegations that St. Mary failed to provide adequate wound care to Carter, which does not concern us for the reasons stated in footnote 2, *ante*. In fact, only the last paragraph of the Ransbury declaration discussed the ethics committee meeting or the topic of Carter's consent to the pacemaker surgery. That paragraph reads: "Finally, plaintiffs allege in their operative Complaint that hospital defendants fraudulently concealed from Maxine Stewart the fact that Mr. Carter was to undergo pacemaker implantation surgery. Based on my review of the above-referenced materials, I note that the sole determination of the Ethics Committee was that the Power of Attorney was valid and that the Power of Attorney indicated that all life-saving measures were to be done for Carter. The Ethics Committee did not decide whether or not to operate on Mr. Carter. This decision to perform surgery was made by Dr. Ashtiani. This stands to reason given that a patient's surgeon is the one who determines whether a surgical procedure is appropriate and should be performed, not the hospital staff where the surgery is to take place. Accordingly, based on my review of the above noted materials and my education, training and experience, I conclude that hospital defendants had no duty to inform Maxine Stewart that Mr. Carter was to undergo surgery. If such a responsibility existed under the circumstances it would be Dr. Ashtiani's as he was Carter's treating physician and surgeon."

8

Stewart filed written opposition to St. Mary's summary judgment motion.  She generally argued that declarations from two medical experts, Vikram Rajan, M.D., and Charles Pietrafesa, M.D., created triable issues of material fact regarding the standard of care and causation.  Dr. Pietrafesa, who focused most of his opinions on the ethics of conducting an ethics committee meeting as occurred in this case, discussed in detail his opinion "that the decision to implant a permanent pacemaker without appropriate informed consent on this patient fell below the standard of care in the medical community."[5]  He was of the opinion that anyone who wanted to operate on Carter without Stewart's consent was required to obtain a court order, as well as that petitioner or her representative should have been at the ethics committee meeting, which he called a "sham."  Finally, Dr. Pietrafesa concluded that the act of "authorizing and proceeding with this unnecessary surgery directly resulted in the patient's cardiac arrest and resulting death."  For his part, Dr. Rajan opined that Dr. Denton breached the standard of care by informing St. Mary that the "surgery to implant a permanent pacemaker was a life threatening condition that required immediate action."  In Dr. Rajan's opinion, there was no evidence that a pacemaker was needed on an emergency basis.  Like Dr. Pietrafesa, Dr. Rajan determined that the pacemaker surgery led to Carter's death.

---

[5]  From 1992 to 2009, Dr. Pietrafesa served as the Executive Medical Director and Chief Medical Officer at St. John's Health Center in Santa Monica, California.  In that capacity, he was "responsible for the management of the ethic committee," established the hospital's bioethics service, and "had consulting and direct line responsibility for the day to day operations of the activities of the hospital's bioethics function."

In addition to the declarations of Dr. Pietrafesa and Dr. Rajan, Stewart relied in part on evidence in the form of doctor's notes[6] from Carter's medical file. These establish the following:

Dr. Denton noted on the February 1, 2012 admission form that Carter had "a long complex history" and described Carter's social environment as "fairly supportive." After a consultation that occurred the day after Carter's admission, a different doctor described him as "markedly somnolent" and indicated that he "open[ed his] eyes only transiently."

On February 6 or 7, 2012, Dr. Denton completed a doctor's note regarding "extensive discussions" he had with Stewart regarding Carter's caloric intake on an undisclosed date. The note reflects that Stewart asked to wait until after a calorie count was completed before placing a g-tube, and that she still did not want a g-tube. She said Carter was "taking in more calories now" after Dr. Denton indicated Carter was not consuming adequate nutrition. Although Dr. Denton agreed to make a final decision about g-tube placement later, he indicated he would ask to have Carter "observe[d] during the intervals when the family is in the room."

Rajeev Yelamanchili, M.D., is the doctor who had previously treated Carter for sleep apnea, as alleged in the operative pleading. On February 7, 2012, Dr. Yelamanchili consulted with Carter regarding "obstructive sleep apnea syndrome [(OSA)] with sinus pauses"; he stated Carter had been diagnosed with "severe OSA . . . 2 years back." He

---

[6] Various doctor's notes refer to Carter's "girlfriend" or "wife." The operative pleading refers to Stewart as Carter's "partner," and one of Stewart's experts referred to her as Carter's "life partner." We follow the parties' convention and infer that any references to Carter's partner, girlfriend, or wife are to Stewart.

suggested treating Carter's apnea "to see how the sinus pauses are," said he would be "happy to follow [Carter] as an outpatient after discharge," and indicated a repeat study might need to occur because Carter had lost a significant amount of weight. Dr. Yemanchili's report concludes with: "If the follow up study fails to reveal evidence of OSA with sinus pauses then permanent pacemaker will be indicated. I have informed this to the wife and she is satisfied."

On February 8, 2012, Arnab Biswas, DO, provided a consultation regarding placement of a g-tube because Carter was "unable to take anything by mouth." Dr. Biswas noted Carter was "a very poor historian. He only grunts and mumbles and is unable to provide any intelligible history." Because Stewart was "unavailable," Dr. Biswas was forced to obtain much of Carter's history from records and physical examination. Dr. Biswas indicated that someone would discuss "risks and benefits of" g-tube placement with Stewart, as well as that "TPN would be a good short-term solution" if a g-tube was intolerable or impossible.

The next doctor's note in chronological order is signed by Dr. Denton and dated February 18, 2012. After a notation that "[m]uch has happened over the last 24 hours," Dr. Denton described the ethics committee meeting and the decision reached thereat. He then remarked: "Given this, [Stewart] was contacted by the nursing staff stating we are going to be moving forward with appropriate care of this patient. [¶] What is also clear is that Adult Protective Services has been called and are anxiously await [*sic*] my interview with Adult Protective Services. [¶] So what we have now is, we now have the

11

freedom to provide appropriate care for this patient and today we will be trying to find the appropriate calorie count." After recounting that Carter was oriented to person but not place or time, Dr. Denton opined that Carter "[c]learly" could not make decisions on his own. He then wrote: "If the document is legal, if the power of attorney is legal, then we will proceed appropriately. If the power of attorney is not legal, then we will proceed appropriately with the exact same therapy." The February 18, 2012 doctor's note concluded by indicating that Dr. Denton was waiting for a final calorie count but planned to order g-tube placement and that he would "be making determination regarding the appropriateness of permanent pacemaker placement, even though he has already had a 4 second pause."

Dr. Ashtiani prepared a report after the pacemaker surgery on February 21, 2012. He acknowledged Carter's sleep apnea but stated, "it was determined that patient will definitely benefit from pacemaker due to prevention of malignant form of arrhythmia and its complications especially if it happens and provoked during episodes of sleep apnea." Next, Dr. Ashtiani commented that Stewart had previously revoked consent to the pacemaker surgery and said he told Dr. Denton he "basically discharged [him]self from the rest of the care for the patient."

Dr. Ashtiani then wrote: "Again, I was contacted by Dr. Denton since he had frequent and multiple discussions with the patient's girlfriend due to different medical issues and need for medical intervention and refusal of her to help the patient. She provided with a paper stating as power of attorney which was obtained when the patient

12

was not alert and oriented, to be able to consent for that. Basically, this lady never had any power of attorney, in order to have any legal thing about the case and she of course did not seem to be his best advocate when he needed the most. For that reason, risk management from the hospital got involved and they determined that we should proceed to implant a pacemaker if medically is necessary. I had this discussion with Dr. Kyle as well as Dr. O'Brien and he agreed upon the planned procedure based on this discussion. I also spoke with Dr. Yelamanchili, the pulmonologist and he also agreed upon the planned procedure and the logic behind the implantation of the device. For those mentioned reason, we decided to proceed with the implantation of the device." The final sentence before the report's conclusion section is: "I need to mention, the consent was signed by two physicians which was advocated through risk management, myself, and Dr. Denton."

The final doctor's order contained in our record was prepared by Carter's discharging physician, Huy Nguyen, M.D. The note explained that Dr. Denton had admitted Carter, but that Dr. Nguyen "took over as the primary care physician on request of [Stewart] who has verbal power of authority for second opinion." After initially deeming it inappropriate to remove the pacemaker as Stewart had requested, Dr. Nguyen later consulted with Dr. Arshia Noori and decided to remove the pacemaker, after all. This was because, "on review of the telemonitor strips, it looks like the RV lead was not adequately . . . placed, is autocapturing and then it sent him into cardiac ventricular fibrillation."

13

In addition to these doctor's notes and related records concerning Carter, Stewart relied on deposition testimony from numerous witnesses when opposing St. Mary's summary judgment motion. Stewart herself testified that Carter first gave her authority to make medical decisions on his behalf in 1998 or 1999. She said when she asked Dr. Denton about trying TPN instead of a g-tube during Carter's 2012 admission to St. Mary, his response was, "Absolutely not." He gave no reason. When asked whether, based on her education and training as a nurse, Stewart had developed an impression as to why Dr. Denton might have rejected TPN, her response was, "I believe he wanted [Carter] to be put in a care facility." Stewart confirmed that Carter had been seeing Dr. Yelamanchili for sleep apnea "[f]or many years," and she reported that, when Dr. Denton first told her he recommended a pacemaker, she said, "That's because he has sleep apnea. . . . He needs to be on a CPAP machine." Stewart's "next step" was to contact Dr. Yelamanchili, which she did "the next moment [she] was able to speak to him." When Stewart "told [Dr. Yelamanchili] that Dr. Denton wanted to put in a pacemaker, [Dr. Yelamanchili] said, 'We don't need to do anything invasive. He needs a CPAP machine." Stewart then testified that a St. Mary employee called to tell her a pacemaker surgery had been scheduled; Stewart "just told them, 'I'm not consenting,' and that [she] wanted a second opinion."

One of the other deponents on whose testimony Stewart relied is Susan Alvarez, who was asked by her director, Mia Bunch, to participate in the ethics committee meeting

14

"as a member of the risk management team."[7] Alvarez explained that Dr. Denton called Bunch, in her capacity as St. Mary's risk manager, to discuss concerns he had regarding Carter's care. Sometime before noon on Friday, February 17, 2012, the ethics team, including Alvarez, met in a conference room; Dr. Denton participated by telephone. The meeting lasted approximately 20-30 minutes and included Alvarez, a case manager named Minda, someone from social services, a woman named Mary, and a nonclinical employee named John Perring-Mulligan. Avarez is "not clinical, either." No one "from [Carter's] side" attended. Later the same day, Alvarez, Bunch, and Perring-Mulligan met in the office of St. Mary's CEO to discuss "what the concerns were." Dr. Denton was not present at all, but at least one attorney participated by telephone. After meeting for "[m]aybe 20 minutes," the "action plan," or the determination that the power of attorney was valid but that Stewart was voided as the designee, was made. In "the second part of" this meeting, Bunch was to contact Dr. Denton and tell him about the action plan.

Alvarez explained that, on Tuesday, February 22, 2012, she, Bunch, Dr. O'Brien, and others met with Stewart, who first learned that the pacemaker surgery had occurred. As Alvarez admitted, "the surgery went forward anyway against Maxine Stewart's directive not to proceed." In response to a question implying Dr. Denton had suggested Stewart had some kind of financial motive for refusing the pacemaker, Alvarez stated: "What I recall why he was talking about finances and he was saying that he knew—he

---

[7] Some of the testimony from Alvarez and Bunch that Stewart used in opposing the motion is identical to the testimony St. Mary used to establish the foundational facts we described *ante*. We now summarize only that testimony from Stewart that is new.

knew [Carter], you know, through his office, basically like he's cared for this patient, and he just said that she—maybe it—it could be. I mean he really didn't say why, but he said financial, you know. You need to look at the financial aspect, or he mentioned something about her taking control of money, but that's when our person said, 'That part we don't talk about.' [¶] . . . [¶] John [Perring-Mulligan] basically shut that down."

Bunch's deposition testimony adds the following additional details. Neither Dr. Ashtiani (the surgeon who implanted the pacemaker), Dr. Yelamanchili (the pulmonologist who treated Carter for sleep apnea), nor Dr. Biswas (the author of the "poor historian" doctor's note) participated in the ethics process. Rather, "[i]t was Dr. Denton, from an M.D. standpoint, that was involved in that decision." Although she would not speculate as to his meaning, Bunch admitted Dr. Denton, when told of the action plan, spoke the words, "So my posterior is covered." Bunch also authenticated a note she had written, which reads, "Explained conversation with [power of attorney] Maxine wanting second opinion. Dr. Denton stated, 'I won't do that.' "

Stewart also noted Dr. Denton's deposition testimony established that he and Dr. Ashtiani were both members of the same medical group when they provided care to Carter. Her trial court brief in opposition to St. Mary's motion alleged that "Dr. Denton specifically pushed for the placement of a permanent pacemaker by Dr. Ashtiani, an electrophysiologist, his partner and a surgeon in the same group."

16

Finally, Stewart offered deposition testimony from Dr. Nguyen and Dr. Noori. Both testified that Carter did not require a pacemaker on an emergency basis. Dr. Noori explained that Carter went into cardiac arrest after a lead from the pacemaker dislodged.

Shortly before the hearing on St. Mary's motion for summary judgment and/or adjudication, the trial court heard a similar motion by Dr. Denton. Finding triable issues of material fact existed regarding breach and causation, the court denied Dr. Denton's motion as to Stewart's cause of action for professional negligence. The trial court found the motion procedurally improper as to the elder abuse claim, but it summarily adjudicated the cause of action for medical battery because Dr. Denton "did not physically perform the unconsented surgery." Finally, at least as relevant to this petition, the trial court denied the motion as to Stewart's cause of action for fraudulent concealment. With respect to the latter ruling, the trial court explained: "the February 18, 2012 notes suggest [Dr.] Denton was prepared to ensure the procedure no matter what by involving Adult Protective Services, [Dr.] Denton advocated for the surgery to the committee, and [Dr.] Denton said 'I won't do that' when asked about a second opinion. Thus, a jury could infer that the failure to inform Stewart the surgery would occur was an intentional effort to conceal the scheduling of the surgery."

As previously indicated, the trial court granted St. Mary's motion for summary judgment and/or adjudication, but only as to the causes of action for elder abuse, medical battery, and fraudulent concealment. The court explained it was granting the motion as to the elder abuse claim because "[i]nterpreting the power of attorney then letting a . . .

17

surgery occur was not withholding care or not within custodial capacity." With respect to medical battery, the court's ruling was "the same as . . . [Dr.] Denton's case," or that St. Mary could not be liable because Dr. Ashtiani performed the surgery. The trial court reasoned that St. Mary "didn't direct anybody to do the procedure. Dr. Denton signed the authorization. Ashtiani performed the procedure. Again, the hospital just offered an opinion regarding the health directives in this case." Despite denying summary adjudication on the fraudulent concealment claim when Dr. Denton moved for summary judgment, the trial court granted St. Mary's motion as to that cause of action on the theory that a hospital owes no fiduciary duty to one of its patients.

Stewart lodged evidentiary objections to St. Mary's evidence in conjunction with her opposition, and St. Mary, in reply, did the same with respect to Stewart's evidence. Our record contains no indication that the trial court ruled on these objections; any such objections are therefore presumed overruled and preserved on appellate review. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Stewart does not argue the merits of any of her evidentiary objections in this court. St. Mary does, but only by including in the response a "respectful[] request [that] this [c]ourt consider [its] written objections to Petitioners' expert declarations and disregard the objectionable material therein." We decline the invitation, as "[t]his court is not inclined to act as counsel for . . . appellant and furnish a legal argument as to how the trial court's rulings . . . constituted an abuse of discretion." (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545-546.) We therefore consider all the evidence in the record before us.

DISCUSSION

"A party may move for summary adjudication as to one or more causes of action within an action . . . if the party contends that the cause of action has no merit, . . ." (Code Civ. Proc., § 437c, subd. (f)(1).) "A motion for summary adjudication may be made by itself or as an alternative to a motion for summary judgment and shall proceed in all procedural respects as a motion for summary judgment." (*Id*., subd. (f)(2).)

"A defendant making the motion for summary adjudication has the initial burden of showing that the cause of action lacks merit because one or more elements of the cause of action cannot be established or there is a complete defense to that cause of action. [Citations.] If the defendant fails to make this initial showing, it is unnecessary to examine the plaintiff's opposing evidence and the motion must be denied. However, if the moving papers establish a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing of the existence of a triable material factual issue. In meeting this obligation, the plaintiff may not rely on the mere allegations of its pleadings, but must 'set forth the specific facts showing that a triable issue of material fact exists as to that cause of action. . . .' [Citation.] 'There is a triable issue of fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof.' " (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 81-82 (*Intrieri*).)

Summary adjudication rulings may be reviewed by writ of mandate. (Code Civ. Proc., § 437c, subd. (m)(1).) In this case, writ review is particularly warranted because a second trial would be necessary if we required Stewart to wait until an appeal from the final judgment before deciding that summary adjudication of the causes of action for elder abuse, fraudulent concealment, and medical battery was improper. (*Noe v. Superior Court* (2015) 237 Cal.App.4th 316, 324.) Although we independently review orders granting summary adjudication, we still " 'must "consider all of the evidence" and "all" of the "inferences" reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party.' [Citation.] The trial court's stated reasons for granting summary adjudication are not binding on the reviewing court, which reviews the trial court's ruling, not its rationale." (*Intrieri*, *supra*, 117 Cal.App.4th at p. 81.)

1.      *The trial court erred in summarily adjudicating the elder abuse cause of action*

Stewart argues the trial court erred in summarily adjudicating her cause of action for elder abuse because there are triable issues of material fact regarding whether "denial of care and abuse of custodial power [occurred] with respect to the unauthorized surgical procedure to implant a pacemaker." In response, St. Mary asserts its act of conducting an ethics committee meeting about the power of attorney was not an act implicating

custodial duties toward Carter.[8]  Because, as we now explain, a reasonable jury could find that St. Mary recklessly and/or fraudulently failed to meet its custodial obligations toward Carter, Stewart's position has more merit.

"[The Act] affords certain protections to elders and dependent adults.  Section 15657 of the Welfare and Institutions Code provides heightened remedies to a plaintiff who can prove 'by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57,' and who can demonstrate that the defendant acted with 'recklessness, oppression, fraud, or malice in the commission of this abuse.'  [Welfare and Institutions Code s]ection 15610.57, in turn, defines '[n]eglect' in relevant part as '[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise.' " [Citation.]" (*Winn*,

---

[8] We briefly comment on St. Mary's assertion that "the sole determination [of the ethics committee meeting] was that the Power of Attorney was valid and that the Power of Attorney indicated that all life-saving measures were to be done for Carter," which we interpret to be an attempt by St. Mary to distance itself from the actual performance of the surgery.  Dr. Denton and Dr. Ashtiani, however, described a closer connection between the ethics committee's decision and the surgery itself.  For example, Dr. Denton testified that the result of the ethics committee meeting was that "the pacemaker can be done by the person doing the procedure."  Dr. Ashtiani agreed that the ethics committee gave him the "green light" to proceed with surgery.  Finally, Dr. Ashtiani noted that "risk management" told him he and Dr. Denton could sign the consent form when he completed the report on Carter's pacemaker surgery.  There are at least triable issues of material fact regarding the extent of St. Mary's connection to the performance of the actual surgery.  For these reasons, we feel comfortable, in discussing the issues the parties raise, indicating at times that St. Mary authorized Carter's pacemaker surgery.  We emphasize, however, that the extent of St. Mary's role in the actual performance of the surgery is for a jury to determine.

21

*supra*, 63 Cal.4th at p. 152.)  "The Act seems premised on the idea that certain situations place elders and dependent adults at heightened risk of harm."  (*Id.* at pp. 159-160.)

However, the *Winn* court emphasized that the Act is "not meant to encompass every course of behavior that fits either legal or colloquial definitions of neglect."  (*Winn*, *supra*, 63 Cal.4th at p. 159.)  Rather, "neglect [under the Act] requires a caretaking or custodial relationship that arises where an elder or dependent adult depends on another for the provision of some or all of his or her fundamental needs."  (*Id.* at p. 160.)

To us, it appears Carter depended on St. Mary to meet his basic needs in ways that establish the type of custodial relationship described by the *Winn* court.  In fact, we note Carter's admission to an acute care facility such as St. Mary, standing alone, would have been sufficient to make him a "dependent adult" who would be entitled to the Act's protections even if he had not also qualified as an "elder" by virtue of his age.  (Welf. & Inst. Code, §§ 15610.23, subd. (b) [definition of "dependent adult"], 15610.27 [definition of "elder"]; Health & Saf. Code, § 1250, subd. (a) [definition of "general acute care hospital"].)  The facts of this case further support our conclusion, as Carter was experiencing confusion upon admission, and a doctor's note prepared a week after admission describes him as a "very poor historian" who could not provide a coherent history and tended only to mumble and grunt.  The record also shows that Carter at times needed medical assistance, including a g-tube, to consume adequate calories.  Finally, St. Mary readily admits Dr. Denton told it that Carter's health was poor enough that he required a pacemaker on an emergency basis.  For these reasons, we conclude St. Mary

22

had "care or custody of" Carter and therefore was obligated " 'to exercise that degree of care that a reasonable person in a like position would exercise.' [Citation.]" (*Winn*, *supra*, 63 Cal.4th at p. 152.)

St. Mary does not and cannot deny that it had at least some amount of care and custody over its own patient; rather, it asks us to make a care and custody determination as to the specific circumstances surrounding the ethics committee meeting instead of as to the relationship between Carter and St. Mary as a whole. The ethics committee meeting, in St. Mary's view, was not about the provision of medical care but instead involved only the interpretation of Stewart's power of attorney. Relying on both *Winn* and *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771 (*Covenant Care*), St. Mary argues such a nonmedical or administrative act cannot be deemed custodial, and cannot constitute "neglect" under the Act. We now explain why neither case supports this theory.

In the *Winn* court's words, the type of relationship the Act contemplates is "a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn*, *supra*, 63 Cal.4th at p. 158.) Applying this rule to the facts before it, the court found the provider of an outpatient clinic could not have committed elder abuse against one of that clinic's patients because no custodial relationship was present. (*Id.* at p. 165.) The patient had received only "intermittent,

23

outpatient medical treatment," and "[n]o allegations in the complaint supported an inference that [she] relied on defendants in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers." (*Ibid.*)

We do not see how *Winn* supports the suggestion that "when [St. Mary] interpreted [Carter's] Power of Attorney, [it was] no longer acting as care custodian[], but rather as [a] healthcare provider[] focused on the undertaking of medical services." In fact, in our view, *Winn* supports the opposite conclusion. Here, St. Mary accepted Carter as a patient with knowledge of his "confus[ed]" state, which left him a "poor historian," and its records show Carter at times required assistance with feeding. Moreover, the ethics committee authorized the performance of surgery on Carter's behalf on the assumption that he lacked the ability to consent. In our view, St. Mary had accepted responsibility for assisting Carter with acts for which "[o]ne would not normally expect an able-bodied and fully competent adult to depend on another." (*Winn*, *supra*, 63 Cal.4th at p. 158.)

We see no reason why the facts that the decision to allow Dr. Denton and Dr. Ashtiani to sign the consent to the pacemaker surgery in Carter's stead was made in a setting that was more like a conference room than an examination room, or that St. Mary sought advice from counsel rather than from a doctor other than Dr. Denton, must mean that the ethics committee meeting served a noncustodial function. After all, "it is the defendant's relationship with an elder or a dependent adult—not the defendant's

24

professional standing or expertise—that makes the defendant potentially liable for neglect." (*Winn*, *supra*, 63 Cal.4th at p. 158.) For these reasons, *Winn* better supports the conclusion that the majority of St. Mary's interactions with decedent were custodial. St. Mary has cited no authority allowing or even encouraging a court to assess care and custody status on a task-by-task basis, and the *Winn* court's focus on the extent of dependence by a patient on a health-care provider rather than on the nature of the particular activities that comprised the patient-provider relationship counsels against adopting such an approach.

In support of its position that the ethics committee meeting was simply an administrative task that cannot constitute neglect under the Act, St. Mary relies heavily on *Covenant Care*. There, the court wrote: "As used in the Act, neglect refers not to the substandard performance of medical services but, rather, to the 'failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations.' [Citation.] Thus, the statutory definition of 'neglect' speaks not of the *undertaking* of medical services, but of the failure to *provide* medical care." (*Covenant Care*, *supra*, 32 Cal.4th at p. 783, original italics; see *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331, 337-338.) St. Mary argues that conducting the ethics committee meeting amounts to the "*undertaking* of medical services" and is therefore not actionable on an elder abuse theory. Because this holding from *Covenant Care* occurred in the context of explaining the difference between claims under the Act and claims of "simple

or gross negligence by health care providers," another way of phrasing St. Mary's contention is that, even if everything Stewart alleges is true with respect to St. Mary's treatment of Carter, the most she can prove is that St. Mary committed ordinary medical malpractice.[9] Any such suggestion is incorrect for the following reasons.

First, we are troubled that labeling this case one for no more than professional negligence seriously undervalues the interest Carter had in consenting or objecting to the surgery that, in the opinion of Stewart's experts, contributed to his death. "More than a century ago, the United States Supreme Court declared, 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law. . . . "The right to one's person may be said to be a right of complete immunity: to be let alone." [Citation.]' [Citation.] Speaking for the New York Court of Appeals, Justice Benjamin Cardozo echoed this precept of personal autonomy in observing, 'Every human being of adult years and sound mind has a right to determine what shall be done with his own body. . . .' [Citation.] And over two decades ago, Justice Mosk reiterated the same principle for this court: '[A] person of adult years and in sound mind has the right, in the exercise of control over his body, to determine whether or not to submit to lawful medical treatment.' " (*Thor v. Superior Court* (1993) 5 Cal.4th 725, 731 (*Thor*).)

---

[9] In fact, after petitioner's counsel responded to the tentative ruling with respect to the cause of action for elder abuse at the hearing in the trial court, counsel for St. Mary stated: "What counsel just finished describing was a rock-solid case for professional negligence."

This right, the right to personal autonomy, is the right St. Mary denied Carter by authorizing Dr. Ashtiani and Dr. Denton to sign the consent for the pacemaker on Carter's behalf. This form was signed not only without Carter's consent, but over the objection of his designee. The California Supreme Court has described the right to consent to medical treatment as " 'basic and fundamental,' " "intensely individual," and "broadly based." (*Thor*, *supra*, 5 Cal.4th at pp. 735-736, 741.) The same court has also emphasized that excusing the patient from a judicial proceeding regarding a surgery to be performed over his objection "denie[s] fundamental due process." (*Id.* at p. 733, fn 2.) It is immaterial that a doctor has said the treatment is required to save the patient's life.[10] (*Id.* at p. 739.) Rather, " 'A doctor might well believe that an operation or form of treatment is desirable or necessary, but the law does not permit him to substitute his own judgment for that of the patient by any form of artifice or deception.' " (*Id.* at p. 736, fn. omitted.) Finally, the patient's reasons for refusing are irrelevant. "For self-determination to have any meaning, it cannot be subject to the scrutiny of anyone else's conscience or sensibilities." (*Id.* at p. 741.)

Here, it is undisputed that St. Mary authorized a surgery without the consent of either Carter or Stewart. It is also undisputed that St. Mary gave no notice of the ethics committee meeting to Carter or Stewart, and that it gave Stewart no notice that the

---

[10] "Particularly when the restoration of normal health and vitality is impossible, only the person whose moment-to-moment existence lies in the balance can resolve the difficult and uniquely subjective questions involved. Regardless of the consequences, the courts, the medical profession, and even family and friends must accept the decision with understanding and compassion." (*Thor*, *supra*, 5 Cal.4th at p. 741, fn. omitted.)

27

surgery was going to occur. Even if the reasonableness of Stewart's objection were something St. Mary could have taken into account when deciding to void Stewart as Carter's designee, there are triable issues of material fact on this issue. Stewart was not an uneducated patient objecting to a procedure without explanation; instead, at the time of Carter's pacemaker surgery, she was a registered nurse, with knowledge of Carter's history, whom he had chosen repeatedly as the designee of his power of attorney, and who requested a second opinion and suggested a specific possible alternative cause for the gaps in Carter's heartbeat. Moreover, there is evidence Dr. Yelamanchili agreed that Carter's sleep apnea might have been causing the problems that concerned Dr. Denton, and Dr. Nguyen and Dr. Noori testified that the pacemaker was not medically necessary. We have difficulty concluding that the deprivation of a right as important as personal autonomy, if in fact St. Mary is found to have deprived Carter of that right, cannot amount to more than professional negligence in the context of this case.

In a related contention, and relying exclusively on *Cobbs v. Grant* (1972) 8 Cal.3d 229, 239-240 (*Cobbs*), St. Mary argues the most Stewart can have proved is a cause of action for failure to obtain informed consent, which is a type of negligence claim. However, the type of claim *Cobbs* described in sounding in simple negligence was one in which a patient consents to a procedure but later argues the consent was ill-informed due to undisclosed risks. (*Id.* at pp. 239-240.) "The battery theory should be reserved for those circumstances when a doctor performs an operation to which the patient has not consented." (*Id.* at p. 240.) That standard is undeniably met here, which confirms our

28

conclusion that Stewart has alleged and proved something more than a potential medical malpractice claim.

Furthermore, we find the facts Stewart has alleged and proved could support not just some formless cause of action that is something more than professional negligence, but a cause of action for elder abuse, specifically. Any of the following three theories supports this conclusion.

First, if Stewart proves to a jury that St. Mary failed to "exercise that degree of care that a reasonable person in a like position would exercise" with respect to Carter (Welf. & Inst. Code, § 15610.57, subd. (a)(1)), she will have shown that it engaged in actions that constitute neglect under the Act.[11] The above described evidence from Stewart creates triable issues of material fact regarding whether St. Mary appropriately respected Carter's right to personal autonomy, and we have discussed the fundamental nature of that right in detail. St. Mary has offered, and we have found, no reason why a reasonable jury could not find that St. Mary was therefore unreasonable in discharging its custodial obligations to Carter within the meaning of the Act.

In addition, a reasonable jury could find St. Mary committed neglect of an elder within two of the specific categories described by statute. Neglect under the Act can

---

[11] While the Act gives more specific examples of the types of acts that constitute neglect of an elder, this list is nonexhaustive. (Welf. & Inst. Code, § 15610.57, subd. (b).) We have found little discussion of the parameters of this catchall category in the elder abuse cases we have read, but we presume the Legislature created it for a purpose. That the right to autonomy possesses the type of fundamental importance we have described makes it easier to conclude that this is a case that appropriately falls within the catchall provision.

29

include, among other things, the "[f]ailure to provide medical care for physical and mental health needs" (Welf. & Inst. Code, § 15610.57, subd. (b)(2)) and the "[f]ailure to protect from health and safety hazards" (*id.*, subd. (b)(3)). As discussed *ante*, the right to personal autonomy regarding medical decisions is fundamental. (*Thor*, *supra*, 5 Cal.4th at p. 741; see also *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 532 [*Thor* recognized fundamental right in the common law; later cases find the same right derives from the California Constitution].) It seems to us, then, that respecting the patient's right to consent or object to surgery is a necessary component of "provid[ing] medical care for physical and mental health needs." (Welf. & Inst. Code, § 15610.57, subd. (b)(2).) Conversely, depriving a patient of the right to consent to surgery could constitute a failure to provide a necessary component of what we think of as "medical care."

Finally, we think a reasonable jury could find St. Mary "fail[ed] to protect [Carter] from health and safety hazards" (Welf. & Inst. Code, § 15610.57, subd. (b)(3)) by authorizing the surgery in the way it did. Dr. Pietrefesa, who has over a decade's experience as the head of a hospital ethics committee, characterized the ethics committee meeting that occurred here as a "sham" and stated St. Mary needed a court order to authorize a surgery over Stewart's objection. According to Dr. Pietrafesa, the requirement for a court order is a "safeguard [that] is in place to protect the patient from the abuse that occurred in this case." Dr. Pietrafesa also concluded that St. Mary "was required to have representation from Maxine Stewart and/or a representative from the patient present at the meeting to present all the facts pertinent to the decision to ignore the

30

legally binding consent document executed by [Carter]." St. Mary's only evidence on the ethics of the procedure it followed comes from the declaration of Ransbury, a nurse,[12] who concluded that Dr. Ashtiani and only Dr. Ashtiani had a duty to tell Stewart about the surgery; she offered no opinion about whether St. Mary should have told Carter or Stewart that it planned to consider the validity of the power of attorney at an ethics committee meeting. There are at least triable issues of material fact regarding whether St. Mary's decision to authorize the surgery, without notice to Stewart and over her objection and request for a second opinion, failed to adequately protect Carter from health and safety hazards.

For the foregoing reasons, we find Stewart has at least shown the existence of triable issues of material fact regarding whether custodial neglect within the meaning of the Act occurred when St. Mary authorized Carter's pacemaker surgery over Stewart's objection. We now turn to whether she has produced enough evidence that St. Mary "has been guilty of recklessness, oppression, fraud, or malice in the commission of this" neglect, so as to entitle her to the Act's enhanced remedies. (Welf. & Inst. Code, § 15657.) Our task is made easier by the fact that we conclude, *post*, that the trial court erred in summarily adjudicating the cause of action for fraudulent concealment. St. Mary offers no reason why Stewart will have failed to have proved the required state of mind should that eventuality occur.

---

[12] Stewart objected in the trial court that Ransbury lacked foundation to opine about the committee meeting, but the trial court failed to rule on her objection. Because Stewart does not argue the merits of her objections here, we do not pass on this issue.

31

We also conclude there are triable issues of material fact regarding whether St. Mary's actions qualified as reckless. "Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' " (*Delaney v. Baker* (1999) 20 Cal.4th 23, 31-32 (*Delaney*).)

We find uncontroversial the idea that any surgery on a 78-year-old man who has been admitted to the hospital in such a state that St. Mary looked to his designee for consent is potentially dangerous, and testimony from Dr. Noori, Dr. Nguyen, and Dr. Rajan supports Stewart's assertion that the surgery was never necessary. Also, and as discussed *ante*, the evidence shows there are triable issues of material fact regarding whether St. Mary adequately protected Carter from health and safety hazards when it authorized the surgery without the participation of Stewart or anyone "from [Carter's] side," even though it knew Stewart had offered an alternative explanation for the gaps in Carter's heartbeat and requested a second opinion on that issue. St. Mary's suggestion that it cannot be punished for listening to the advice of a doctor in good standing at the hospital fails to account for its decision to structure the ethics committee meeting in an entirely one-sided manner. (See *Covenant Care*, *supra*, 32 Cal.4th 771, 778 [elder abuse plaintiffs alleged defendants concealed the deterioration of patient's condition]; see also *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 405

[enhanced remedies warranted in *Covenant Care* in part because skilled nursing facility "misrepresented and failed to inform [patient's] children of his true condition"].)

For the foregoing reasons, the trial court erred in summarily adjudicating Stewart's cause of action for elder abuse. At oral argument, St. Mary's counsel expressed concern that our holding, especially with respect to the care and custody issue, will be interpreted to mean that any act of negligence by a hospital will constitute elder abuse. We share no such fear, since " ' "cases are not authority for propositions not considered." ' " (*Loeffler v. Target Corp.* (2014) 58 Cal.4th 1081, 1134.) First, and as we have stressed throughout, the right to autonomy in medical decision-making is uniquely fundamental; we offer no opinion about how this petition would have resolved had Stewart alleged a violation of a lesser right. Second, we were careful to describe the evidence introduced by the parties on summary judgment in detail, to focus our inquiry on where and how Stewart's evidence created triable issues of material fact, and to stress that it is the jury's role to determine the extent of St. Mary's role in the pacemaker surgery Dr. Ashtiani performed on Carter. As we explained *ante,* when reviewing summary adjudication orders we " 'must "consider all of the evidence" and "all" of the "inferences" reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party.' " (*Intrieri*, *supra*, 117 Cal.App.4th at p. 81.) We have done so, and we have explained our views about how the rules on which we rely apply to the evidence submitted with the summary judgment motion. We need not make a prediction about how a court should rule in the future when

33

asked to apply today's holding to a set of facts that is missing any of the elements that are present here.

2.    *The trial court erred in summarily adjudicating the cause of action for*

*fraudulent concealment*

Stewart argues the trial court erred in summarily adjudicating her cause of action for fraudulent concealment on the sole ground that, based on the reasoning in *Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 133 (*Moore*), St. Mary did not owe Carter a fiduciary duty.  As we now explain, we agree.

" ' "[T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." ' " (*Boschma v. Home Loan Center, Inc.* (2011) 198 Cal.App.4th 230, 248.)  A duty to disclose will arise: " '(1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.' " (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 336 (*LiMandri*).)

St. Mary argues it cannot be liable for fraudulent concealment because it owed Carter no fiduciary duty under *Moore*. We question the applicability of *Moore* to this case. There, a leukemia patient alleged causes of action against his physician and, among others, a hospital for "using his cells in potentially lucrative medical research without his permission." (*Moore*, *supra*, 51 Cal.3d at pp. 124-125.) The court found these allegations stated causes of action for breach of fiduciary duty and/or lack of informed consent against the physician, Golde. (*Id.* at pp. 128-129.) With respect to the other defendants, the court stated simply, without analysis or citation to authority: "In contrast to Golde, none of these defendants stood in a fiduciary relationship with Moore or had the duty to obtain Moore's informed consent to medical procedures. If any of these defendants is to be liable for breach of fiduciary duty or performing medical procedures without informed consent, it can only be on account of Golde's acts and on the basis of a recognized theory of secondary liability, such as respondeat superior." (*Id.* at p. 133.) Participating in a process that allegedly failed to respect a patient's right to personal autonomy seems very different in kind, for purposes of fiduciary duty analysis, from failing to disclose profits earned from a patient's discarded tissue. (See *Delaney*, *supra*, 20 Cal.4th at p. 33 [purpose of the Act "is essentially to protect a particularly vulnerable portion of the population from gross mistreatment in the form of abuse and custodial neglect."].)

We need not decide whether St. Mary owed Carter a fiduciary duty, however, because a fiduciary duty is not the only circumstance giving rise to a duty to disclose.[13] As we have already established, St. Mary also had a duty to disclose if it had sole knowledge of material facts not known to Stewart, actively concealed at least one material fact from her, or made a partial representation but suppressed at least one material fact. (*LiMandri*, *supra*, 52 Cal.App.4th at p. 336.) Our independent review of the record indicates there are triable issues of material fact regarding each of these theories.[14] St. Mary knew it had authorized a pacemaker surgery to proceed over Stewart's objection because it made this the "action plan" after the ethic committee meeting, and it knew it did not inform Stewart about the surgery. St. Mary also knew of Stewart's objection to the pacemaker procedure, and it chose to tell her about neither the ethics committee meeting nor the upcoming surgery. The cause of action for fraudulent concealment does not fail for lack of duty to disclose.

---

[13] St. Mary argues Stewart only alleged it failed to disclose the date of the surgery in her operative pleading and may not now allege it also committed fraudulent concealment by failing to disclose the scheduling of the ethics committee meeting. Even if the complaint must be read so sparingly, the distinction makes no difference to our analysis.

[14] " 'Although the determination of duty is primarily a question of law, its existence may frequently rest upon' " the nature and extent to which a plaintiff proves the facts allegedly creating a duty to be true. (*Silva v. Union Pacific Railroad Co.* (2000) 85 Cal.App.4th 1024, 1029.) Here, we say there are triable issues of material fact regarding the existence of a duty because whether such a duty exists depends on the nature and extent of Stewart's proof of the facts we are about to summarize. At present, we find only that she has presented enough evidence to take the issue to a jury.

Nor does it fail, as St. Mary argues, for lack of proof of fraudulent intent, as we find no gap in the evidence on this issue. The trial court denied Dr. Denton's motion for summary adjudication of this claim because it found there were triable issues of material fact regarding whether "the failure to inform Stewart the surgery would occur was an intentional effort to conceal the scheduling of the surgery." It appears much the same analysis applies to St. Mary, which is the party that actually made the decision not to advise Stewart of the ethics committee.

Although Dr. Denton was the only clinical person who took part in the first ethics committee meeting, we think it fair to infer that the risk management team would have reviewed the doctor's notes contained in its own file on Carter; otherwise, it seems the ethics committee meeting would have no purpose but to simply rubber stamp whatever procedure Dr. Denton recommended. To at least some readers, these notes will likely reflect an increasing level of animosity between Stewart and Dr. Denton, with Carter's admission note indicating his home environment was "fairly supportive," while a note from a consultation only five or six days later said Dr. Denton wanted Carter observed while his family was with him. This second note memorialized a consultation in which Dr. Denton "extensive[ly]" discussed his recommendation for placement of a g-tube, and Stewart still said she did not want one. It is a reasonable inference that conflicts such as these are what led to the involvement of Adult Protective Services, which was, according to a doctor's note by Dr. Denton, "anxiously awaiting" an interview with him. In addition, a note from Dr. Yemanchili indicated there may have been some merit to

37

Stewart's suggestion that Carter be treated for sleep apnea before a surgery occurred. Since the discussion about Carter's power of attorney reached St. Mary's CEO, it appears multiple layers of people at the hospital had a reason to read these notes, if they intended to conduct a fair and adequate review before making an ethics committee decision. To a reasonable jury, these notes might be an indication that St. Mary ignored cause for concern about Dr. Denton's impartiality.

In addition, Bunch, who is a director of risk management, knew Dr. Denton's response when she told him of the action plan was that his "posterior was covered," as well as that his response to Stewart's request for a second opinion was simply, "I won't do that." Finally, St. Mary knew Dr. Denton made some kind of allegation that Stewart had a financial motive for refusing to consent to the pacemaker surgery because, at the ethics committee meeting, Perring-Mulligan had to "shut that down" when Dr. Denton broached the topic. Again, a jury could infer that St. Mary had particular reason to ensure that Stewart was involved in the process of authorizing the pacemaker surgery, or that she had notice that a surgery had been scheduled, but instead deliberately decided to exclude her from the process.

Perhaps a reasonable jury would view these facts and think St. Mary was innocently blindsided by a misguided doctor, as St. Mary's response implies. But it seems to us a reasonable jury could instead conclude that St. Mary intentionally concealed the surgery because it and Dr. Denton had become weary of Stewart's habit of refusing what Dr. Denton thought was necessary treatment. In other words, there are

triable issues of material fact regarding St. Mary's intent in concealing facts from Stewart, just as there are regarding its duty to disclose those same facts. The trial court therefore erred in summarily adjudicating the fraudulent concealment claim.

3. *The trial court erred in summarily adjudicating the cause of action for medical battery*

The trial court summarily adjudicated the cause of action for medical battery solely because Dr. Ashtiani, not St. Mary, actually performed the pacemaker surgery. Petitioner argues there are triable issues of material fact regarding St. Mary's connection to the surgery. We again agree.

"Battery is an offensive and intentional touching without the victim's consent." (*Kaplan v. Mamelak* (2008) 162 Cal.App.4th 637, 645 (*Kaplan*).) The elements of a cause of action for medical battery are: (1) That the defendant either performed a medical procedure without the patient's consent or performed a medical procedure that is substantially different from one to which the plaintiff consented; (2) that the plaintiff suffered harm; and (3) that the defendant's actions were a substantial factor in causing the plaintiffs' harm. (CACI No. 530A.)

The record in this case belies St. Mary's suggestion that it had no connection to the performance of the surgery simply because Dr. Ashtiani, an independent contractor, made that decision. As we have already described in footnote 8, *ante*, Dr. Denton and Dr. Ashtiani both testified that the decision of the ethics committee was the event that allowed the surgery to occur. Moreover, Dr. Ashtiani's comment in the postoperative

39

report—"I need to mention, the consent was signed by two physicians which was advocated through risk management, myself, and Dr. Denton"—could easily be interpreted to mean that St. Mary specifically advised Dr. Ashtiani to sign the consent form, without which the surgery likely could not proceed at all.

Neither party has cited authority defining how distant the connection a defendant has to the touching that occurs when a doctor performs surgery, to which the patient has not consented, may be before the plaintiff loses a right to a cause of action for medical battery. "In the absence of any definitive case law [setting the boundary St. Mary asserts], we conclude the matter is a factual question for a finder of fact to decide." (*Kaplan*, *supra*, 162 Cal.App.4th at p. 647.) There are triable issues of material fact regarding whether St. Mary was sufficiently involved in the process of allowing the pacemaker surgery on Carter to have "performed a medical procedure" within the meaning of CACI No. 503A.

DISPOSITION

Let a peremptory writ of mandate issue, directing the Superior Court of San Bernardino County to vacate the October 3, 2016 order granting summary adjudication of Stewart's causes of action for elder abuse, fraudulent concealment, and medical battery, and to substitute an order denying the motion as to those causes of action. The temporary stay we issued is to dissolve upon the filing of this opinion.

Stewart is directed to prepare and have the peremptory writ of mandate issued, copies served, and the original filed with the clerk of this court, together with proof of service on all parties.

Petitioner is awarded her costs on appeal.

CERTIFIED FOR PARTIAL PUBLICATION


RAMIREZ
P. J.


We concur:


McKINSTER
J.


MILLER
J.