Filed 1/26/22

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| OROVILLE HOSPITAL, | C090570 |
| Petitioner, | (Super. Ct. No. 16CV03116) |
| v. | |
| THE SUPERIOR COURT OF BUTTE COUNTY, | |
| Respondent; | |
| LYNDA AMBROSE et al., | |
| Real Parties in Interest. | |

APPEAL from a judgment of the Superior Court of Butte County, Robert A. Glusman, Judge. Reversed.

Schuering Zimmerman & Doyle, Robert H. Zimmerman and Alaina T. Dickens; Horovitz & Levy, Jeremy B. Rosen, and Mark A. Kressel for Petitioner.

No appearance for Respondent.

1

Law Offices of Joseph M. Earley III, Joseph M. Earley III, James Schacht, and Cameron M. Easterling for Real Parties in Interest.

Prior to her death, Eyvon Ambrose (decedent) had become entirely dependent upon others for her basic care needs. She depended on her granddaughter, Rebecca Foster, for basic needs such as dressing, eating, taking medications, using the restroom, attending physician appointments, and diabetes management. Oroville Hospital d/b/a Golden Valley Home Health and Oroville Hospital, the petitioner here and defendants in the underlying actions (defendants), agreed to provide decedent in-home nursing services for wound care for a pressure injury to her left ischium or buttock. Defendants provided such in-home wound care on six occasions in July 2015 and four additional occasions in October 2015. According to real parties in interest, who are plaintiffs in the underlying actions (plaintiffs), decedent's wound worsened, she sustained additional wounds, she was hospitalized, and she ultimately died from her wound and complications.

Plaintiffs commenced the underlying actions against defendants alleging a number of causes of action. Defendant's writ petition and arguments relate solely to plaintiff's cause of action to recover under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq. [statutory section citations that follow are to the Welfare and Institutions Code unless otherwise stated]) (the Elder Abuse Act) for defendants' alleged neglect which, they asserted, was committed with recklessness, oppression, fraud, or malice. Therefore, plaintiffs asserted entitlement to enhanced remedies under the Elder Abuse Act. They seek no other relief in their petition.

Defendants moved for summary judgment or, in the alternative, summary adjudication. They asserted they did not have a substantial caretaking or custodial relationship with the decedent, a prerequisite for recovery for neglect under the Elder Abuse Act as discussed in *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148 (*Winn*). They further asserted that a reasonable jury could not find them guilty of forms

of abuse or neglect rising to the level of recklessness. The trial court denied defendants' motion.

Defendants seek a preemptory writ of mandate directing the trial court to vacate its denial of their motion for summary adjudication and to grant the motion. They reprise both contentions described *ante*, and maintain that, if we agree with them on the threshold issue as to the substantial caretaking or custodial relationship, we need not reach the issue of recklessness.

We conclude that, in opposition to defendants' prima facie showing of entitlement to summary adjudication on plaintiffs' Elder Abuse Cause of action based on the absence of a substantial caretaking or custodial relationship, plaintiffs failed to raise a triable issue of material fact. We will issue the requested writ.

## FACTS AND HISTORY OF THE PROCEEDINGS

### The Underlying Actions and Plaintiffs' Allegations

In case No. 16CV03116, plaintiffs, decedent's children and grandchildren, commenced an action in Butte County Superior Court against defendants, asserting a cause of action to recover for the wrongful death of decedent.

In case No. 17CV02568, decedent through her successor in interest, commenced a second action in the Superior Court, Butte County. Plaintiff in that action pleaded causes of action to recover for elder abuse and willful misconduct. The trial court consolidated the two actions under case No. 16CV03116.

Plaintiffs in 17CV02568 alleged that, on July 9, 2015, decedent was referred by her medical provider for in-home nursing care for a pressure injury to her left ischium or buttock. Defendants evaluated decedent and began providing in-home nursing services on July 11. Decedent's dressings were to be changed every three to four days and as needed to cover with Hydrocolloid film dressing to assist with autolytic debridement. According to plaintiffs, based on decedent's condition, which included eschar, or a

3

blackish, scab-like covering, on her left buttock, Hydrocolloid dressings were not appropriate. Plaintiffs asserted that, in violation of the applicable standard of care, defendants failed to recommend decedent be transferred to Oroville Hospital for evaluation and wound debridement.

On July 13, 2015, defendants evaluated and provided wound care to decedent. Defendants determined decedent "was 'likely to remain in fragile health and have ongoing high risks of serious complications and death . . .' " According to plaintiffs, on three subsequent occasions, on July 15, 17, and 20, 2015, defendants evaluated and provided wound care to decedent. The wound, according to plaintiffs, was malodorous, increasing in size, and worsening. However, defendants falsely documented the wound status as unchanged. Defendants continued to fail to recommend decedent be transferred to Oroville Hospital for evaluation and wound debridement. On July 27, 2015, defendants documented the wound appeared to be " 'infected with large area of induration filled with purulent drainage,' malodorous." Someone called 911, and decedent was transferred to the Emergency Department at Oroville Hospital. At this time, decedent had "a very large pressure injury with pustular drainage, requiring IV antibiotic and surgical debridement." Decedent had developed sepsis. On July 29, 2015, decedent underwent an operation on her wound, and, on August 7, 2015, further surgical debridement was performed. Decedent was discharged to Oroville Hospital Post Acute Care in August 2015. By October 7, 2015, her wound had healed considerably, and she was discharged home on October 14, 2015, with a new order for home health wound care. Two days later, defendants resumed home health services for the same wound.

According to plaintiffs, by this time, defendants were "thoroughly aware from their previous home health services a few months earlier that [decedent], who was in poor health and lived alone, was not safe in her environment. [Defendants] . . . had affirmatively determined that 1) the caregiving assistance available to [decedent] 'did not meet her needs'; 2) [decedent] was incontinent, and, because she did not have appropriate

4

care available to her, she 'sits in diaper all day'; 3) she needed 'a higher level of care' than she could receive in the home; 4) the caregiver [(here, presumably, Foster)] was 'having great difficulty caring' for [decedent's] wound; 5) the caregiver is 'having great difficulty transferring' [decedent]; and 6) there were clear 'deficits' with the management of" decedent's illness.

On October 16, 2015, defendants assessed decedent, whose ischium wound had worsened after her discharge two days prior. She also had a large wound to her coccyx "measuring 7x8 with an undetermined depth but believed to be very serious." Defendants did not transfer decedent to Oroville Hospital for evaluation. On October 19, 2015, defendants again provided wound care to decedent. Her newly discovered coccyx wound "was breaking open" and her ischium wound had deepened. According to plaintiffs, both wounds were worse than they were during the previous visit. However, defendants reported the coccyx wound was unchanged. Plaintiffs alleged decedent's daughter "questioned [defendants] multiple times whether [decedent] should be treated at the hospital. [Defendants] noted that [decedent's] daughter was 'overwhelmed by severity of wound and keeps asking if patient should go back to hospital. Of concern volume of wound drainage and patient's severe protein calorie malnutrition.' " (Bold omitted.) Defendants again did not transfer decedent to Oroville Hospital. On October 20, 2015, according to plaintiffs, defendants noted (1) decedent was not a good candidate for wound healing at home; (2) her nutritional status was poor and she likely would not qualify for wound VAC at home; (3) the newer coccyx wound was developing into a stage four ulcer requiring debridement; and (4) Foster felt unsafe transferring decedent because the process "required a two person assist to transfer, which was not available." Defendants again did not transfer decedent for evaluation of her coccyx wound.

It was further alleged that on October 21, 2015, defendants again provided wound care. Decedent's wounds were worsening and were malodorous with eschar. Defendants continued to report the coccyx wound was unchanged in size. Since decedent had

5

returned home, she had developed two additional pressure injuries, and, according to plaintiffs, all wounds had worsened. Decedent's wound with eschar required debridement, but defendants did not transfer her to Oroville Hospital. On October 23, 2015, defendants again provided wound care. Defendants failed to measure any of decedent's four wounds. Defendants evaluated Foster's ability to care for decedent safely at home and, according to plaintiffs, failed to report that her needs were not being met. Decedent's wound care orders largely remained unchanged. On October 24, 2015, decedent's family called 911 and decedent was taken to Oroville Hospital. Decedent was suffering from sepsis.

Decedent's coccyx wound was substantially larger, and her prognosis was very poor due to deterioration of her wounds and malnutrition. She underwent surgery two days later. The original wound had worsened considerably and was much larger. Decedent required additional surgical intervention on November 5, 2015. She was subsequently discharged to Post Acute Care, but she never regained her health. She became septic and ultimately died on February 26, 2016, at Oroville Hospital following a final admission for toxic metabolic encephalopathy from pneumonia and wounds.

In the only cause of action relevant here, to recover under the Elder Abuse Act, plaintiffs asserted decedent had been in the care and custody of defendants. According to plaintiffs, decedent "required hospitalization due to [defendants'] conscious and deliberate disregard for [her] health, safety and well being, resulting in her coccyx wound, deteriorating from a manageable stage to a cavernous 20 cm x 30 cm, insurmountable gangrenous wound. [Her] wound was so extensive by the time she was admitted to the hospital that she required a diverting colostomy and suffered sepsis, loss of bone, bits of muscle and subcutaneous tissue. . . . Defendant[s'] . . . gross neglect, and despicable conduct was a substantial factor in causing [decedent] harm." Plaintiffs asserted defendants' care, and lack thereof, was committed with recklessness, oppression, fraud, or malice. Therefore, plaintiffs asserted entitlement to enhanced remedies under

6

section 15657, including damages for decedent's pre-death pain and suffering and reasonable attorney fees and costs.

<u>Defendants' Motion for Summary Judgment or Summary Adjudication</u>

Defendants moved for summary judgment or, in the alternative, summary adjudication pursuant to Code of Civil Procedure section 437c. As to the Elder Abuse Act cause of action, relying on our high court's decision in *Winn, supra*, 63 Cal.4th 148, defendants argued they did not have a substantial caretaking or custodial relationship with decedent. According to defendants, they only provided in-home wound care on six occasions in July 2015 and four occasions in October 2015. For all other aspects of her care, decedent relied on Foster. According to defendants, the scope of their care for decedent did not amount to a "robust" and "substantial" caretaking relationship of the type contemplated by the Elder Abuse Act as explained in *Winn*. Further, defendants asserted that, even assuming their alleged "omissions" could be proven, they would amount only to professional negligence, not reckless neglect within the meaning of the Elder Abuse Act.

Defendants submitted an expert declaration of Steven Fugaro, M.D. Fugaro stated, in part: "Defendant[] w[as] not responsible for assisting decedent with personal hygiene or with the provision of food, clothing, or shelter. Based on my review of the records, decedent was not reliant on defendant[] for her basic needs such as bathing and hydration. [Defendant] merely provided in home nursing wound care on six occasions from July 11, 2015 through July 27, 2015 and four occasions from October 16, 2015 through October 24, 2015." Fugaro also opined that defendants' care of decedent complied with the applicable standard of care.

Defendants also submitted portions of Foster's deposition testimony. Foster testified she was decedent's caretaker at the relevant times. Decedent needed help getting dressed, getting food, getting medicine, and getting to and using the bathroom. Foster got

7

adult diapers for decedent and Foster changed decedent's diapers three times a day. Foster also took decedent to dialysis appointments and to doctor appointments. Foster administered decedent's insulin injections and monitored her blood sugar. Foster would get decedent up in the morning, get her out of bed, and get her into her wheelchair. She also helped her get around the house. Asked what she understood the home health care nurse's role to be, Foster testified she "thought they were going to come and do the job and take care of the wound, but they taught me once and expected me to do all the job."

Additionally, defendants submitted decedent's healthcare records from both her home health care and Oroville Hospital.

Defendants submitted additional deposition testimony largely relevant to specifics about their care of decedent. One witness testified decedent's daughter was concerned about the severity of decedent's wound and wondered if she should go back to the hospital, and another testified Foster agreed decedent should go to the hospital. Several of these witnesses testified it had been recommended decedent go to the emergency room, but that decedent refused. In contrast, plaintiffs submitted a declaration which, among other things, stated there was no documentation that defendants' nurses recommended decedent go to the hospital. Foster and decedent's daughter testified decedent did not refuse to go to the hospital. Even if this conflict could give rise to a triable issue of material fact as to defendants' alleged recklessness, it is not strictly relevant to our threshold determination whether defendants had a caretaking or custodial relationship with decedent. Accordingly, we do not detail this testimony further. For the same reason, we do not detail the parties' experts' opinions as to whether decedent was of sound mind so as to be competent to refuse a higher level of care. While mental acuity and competency may be relevant in determining the existence of a caretaking or custodial relationship (see *Stewart v. Superior Court* (2017) 16 Cal.App.5th 87, 102 (*Stewart*)), under the circumstances of this case, it is not necessary to our determination.

8

In opposition to defendants' motion for summary judgment, plaintiffs asserted there was a sufficiently robust caretaking relationship between defendants and decedent to establish a triable issue of fact as to whether defendants had care or custody of decedent. Plaintiffs asserted defendants assumed a significant measure of responsibility for attending to decedent's wound care "involving more than casual or limited interactions." According to plaintiffs, the "nature of the caretaking relationship thus fits easily within the type of caretaking or custodial relationship contemplated by *Winn*." Plaintiffs asserted whether defendants had care or custody of decedent should be determined by the trier of fact. Additionally, plaintiffs asserted defendants' admission contract with decedent provided that defendants were to provide her with " '*whatever* home health treatment, procedure, and/or services that are deemed necessary by the attending physician in consultation with the staff of Golden Valley Home Health.' "

Plaintiffs asserted that defendants knew in October 2015 decedent's condition was deteriorating rapidly and that her family was unable to provide adequate care for her, yet defendants neither increased the care provided nor transferred decedent to a higher level of care. According to plaintiffs, this clearly implicates neglect within the meaning of the Elder Abuse Act.

Plaintiffs further asserted triable issues of fact existed as to whether defendants' conduct was reckless within the meaning of the Elder Abuse Act. According to plaintiffs, defendants "had knowledge of conditions likely to cause injury to [decedent], yet made repeated conscious decisions to do nothing substantial to prevent further injury caused by [her] worsening pressure injuries."

Plaintiffs submitted what they refer to as defendants' "admission contract" with decedent, which is actually entitled "Conditions of Admission." (Capitalization omitted.) It provided, in part, that decedent "consent for treatment and release of information – I

9

hereby consent to receive whatever home health treatment, procedure, and/or services that are deemed necessary by the attending physician in consultation with the staff of Golden Valley Home Health." (Capitalization omitted.)

Plaintiffs also submitted a declaration by Linda Sullivan, R.N. Sullivan opined defendants' care and treatment of decedent fell below the applicable standard of care in both July and October 2015. Specifically, defendants (1) accepted decedent as a patient despite the fact that she was not an appropriate candidate for home health care; (2) failed to provide proper wound care; (3) failed to provide proper physician oversight; (4) failed to transfer decedent to a higher level of care when required; and (5) retained decedent as a patient despite the fact that defendants could not provide adequate home health care. Sullivan also asserted defendants attempted to delegate skilled wound care to Foster, and later to decedent's daughter, and that it was unconscionable for defendants "to attempt to shift so much responsibility for [decedent's] wound care to family members . . . ." Concerning whether defendants had care or custody of decedent, Sullivan stated defendants were not responsible for all aspects of decedent's care, but did assume a significant measure of responsibility for attending to decedent's "wound care needs."

Plaintiffs, too, submitted portions of Foster's deposition testimony. Plaintiffs emphasized the passage in which Foster testified she understood the home health care provider's role to be "to come and do the job and take care of the wound, but they taught me once and expected me to do all the job." In portions of the deposition furnished by plaintiffs, Foster was asked about telling the home health care nurses she was uncomfortable providing wound care. She testified: "The second that the nurse came to take -- see the wound, I told them that I thought it was too much. I thought it was too much. I was overwhelmed. She just got home, and she's got another wound already. That -- I told them -- I didn't think she needed to be home already. If she came back like that, I did not think she needed to be at the house." Foster told the home health care staff that decedent needed to go back to the hospital. She brought it up perhaps "every time

10

they came because it was overwhelming to me." She testified that she was clear that she felt very uncomfortable providing the type of wound care they expected her to provide, and further testified: "they should have been able to see that with me as they're trying to teach me to do the wound care. As I'm shaking like crazy trying to do the job that they're trying to teach me to do, they should have noticed that I was stressed, way stressed."

### Defendants' Reply

In reply, defendants asserted plaintiffs failed to raise a triable issue of fact as to whether there was a sufficiently robust caretaking relationship, and, therefore, summary adjudication must be granted as to the Elder Abuse Act cause of action. Defendants emphasized they provided in-home care to decedent six times in July 2015, and did not see her again until they provided her with in-home care on four additional instances in October 2015. Defendants' nurses "were not responsible for bathing, feeding, changing, or transporting decedent," but rather decedent was dependent on Foster "for all other aspects of daily living." According to defendants, their "limited interactions do not qualify as substantial, significant, or robust." Defendants further asserted plaintiffs failed to demonstrate defendants' conduct was reckless. According to defendants, plaintiffs' opposition "frames a picture of alleged substandard care, not a reckless withholding of care by defendants."

### Oral Argument Before the Trial Court

At oral argument before the trial court, defendants continued to rely on *Winn* and asserted "there is a bright line distinction to be drawn between elder abuse and professional negligence." According to defendants, to support an Elder Abuse Act cause of action, "there has to be a failure at withholding or a denial of care." Defendants asserted what they characterized as plaintiffs' contention—that the in-home healthcare nurses did not send decedent to a higher level of care when she needed it—was "almost

11

on all fours with the Winn case, where a primary care provider saw a patient, probably more often than the home healthcare providers saw the decedent, and failed to refer her on to see a vascular surgeon." Under these circumstances, defendants asserted, our high court concluded the facts lent themselves to a finding of professional negligence, not elder abuse, because there was not a substantial, robust, or significant caretaking relationship, and there was no deprivation of care.

Plaintiffs responded the failure to transfer was indeed a deprivation of care, but further asserted "there's far more to it than that." Plaintiffs asserted that the failure to provide appropriate dressings for a wound with eschar constituted neglect. They emphasized defendants' attempt to delegate wound care to untrained and unqualified family members. They further emphasized the failure to obtain physician oversight. Finally, plaintiffs emphasized that, "most importantly," defendants failed "to transfer in October, 2015, when the daughter and granddaughter are saying, 'Doesn't she need to go back to the hospital?' " Paraphrasing *Winn*, plaintiffs asserted of the caretaking or custodial relationship: " 'It's one where a party assumes a significant measure of responsibility for attending to one or more of an elder's needs.' " Plaintiffs asserted, "obviously [defendants] [were] primarily responsible for the wound care . . . , and they failed miserably in that regard."

The court posed a question concerning the underlying contract. The court stated, "It says, 'I consent for treatment, release of information. I hereby --' and then it says, 'I hereby consent to receive whatever home-health treatment procedural --' and I don't know what that means, 'and slash CP services that are deemed necessary by the attending physician in consultation with the staff of . . . ' " defendants. The court continued: "It would seem to me that if the attending physician at Golden Valley Home Health does not provide any care -- and I know that's not the fact here. Does not provide any care, that that does provide grounds for a custodial relationship that has been thrown out. In other words, if Golden Valley said we're going to provide all your wound care, and they don't

12

provide any at all, doesn't that raise to the level of the Elder Abuse Act?" It is clear the trial court's hypothetical question did not reflect any facts or allegations in this case.

Defendants responded: "I would say no, it doesn't. And under a hypothetical situation it doesn't apply, because they're looking at one limited scope of this individual's care and treatment. The evidence that was submitted, if we take that in conjunction with your hypothetical here, being the decedent's granddaughter, she testifies she does everything; helps her bathroom, helps her get transportation, gets her out of bed, puts her in bed, helps around the house, changes diapers, changes her clothing, gets her fed, takes care of her diabetes, takes her to her nephrology and dialysis appointments. . . . So that is who's providing primary caretaking services. [¶] And I think what's important to keep in mind here is even considering this contractual obligation -- you mentioned the shortcomings that the plaintiff is citing to here is medical care. They're taking issue with wound care, they're taking issue with how they delegated wound care duties, they're taking issue with professional obligations. This was a professional relationship, this was not a custodial relationship; one that you would see in a skilled nursing setting, for example. The issue here is medical malpractice, the issue is not elder abuse."

Plaintiffs replied that the relationship need not necessarily be custodial. "[I]t's a situation where a party assumes a significant measure of responsibility for attending to one or more of the elder's needs. So it's irrelevant that the granddaughter is also providing care."

The court then asked whether defendants' assumption of responsibility for wound care would have any effect on, for example, diabetes care or changing diapers. Defendants responded in the negative, and continued: "it puts into perspective the robustness, the significance, the substantialness of this caretaking relationship, and it puts into perspective the fact that it's medical care being provided, not a deprivation of care. There was no reckless withholding of care here. They take issue with how the care was effectuated. That's professional negligence." Plaintiffs responded that decedent's

13

progression, developing wounds after her release, demonstrated "a definite failure to get her back to the hospital or to a skilled nursing facility where she can get the higher level of care."

Trial Court's Order

The trial court denied defendants' motion for summary judgment or, in the alternative, summary adjudication. The court only stated: "The Court finds that triable issues of material fact exist as to whether Defendants had a substantial caretaking or custodial relationship with Decedent, whether the care and treatment Defendants provided to Decedent was within the applicable standard of care, and whether Defendants were a substantial factor in causing Decedent's death."

Defendants' Petition

Defendants filed a petition for a writ of mandate seeking relief from the trial court's denial of their motion for summary adjudication of the plaintiffs' elder abuse claim.

According to defendants, plaintiffs' own evidence demonstrated defendants' nurses did not assume responsibility for attending to decedent's basic needs or put themselves in a position where they could assert control over whom she sought out to treat her wound. Defendants contend that "the very core of plaintiffs' complaint is that defendants *should* have taken this responsibility but did not." In this regard, they assert the "gravamen of plaintiffs' complaint is that [defendants'] nurses failed to transfer [decedent] to the hospital for in-patient care—in essence that defendants *failed* to take on the type of caretaking or custodial relationship envisioned by *Winn*." Defendants assert plaintiffs failed to tender admissible evidence to show defendants' nurses had a " 'substantial,' 'significant,' and 'robust' caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient," as required under the Elder Abuse Act. According to defendants, because "plaintiffs' elder abuse

14

claim cannot proceed without their proving this threshold issue, summary judgment should have been granted and writ relief is proper now."

Defendants further assert plaintiffs failed to furnish admissible evidence that defendants' nurses engaged in acts constituting reckless neglect or withholding of care. According to defendants, plaintiffs' evidence establish they are only able to raise trial issues of fact regarding professional negligence. Defendants assert plaintiffs failed to raise triable issues of material fact that defendants actually withheld care with a conscious disregard that a serious injury was highly likely.

Defendants maintain that, if plaintiffs' elder abuse claim was allowed to proceed, it would needlessly complicate the trial, expose them to punitive damages and uncapped noneconomic damages, and provide plaintiffs with "unwarranted settlement leverage."

Thus, defendants seek a writ directing the trial court to vacate its order denying their summary adjudication motion and enter a new order granting the motion.

DISCUSSION

I

*Summary Judgment, Summary Adjudication, and Standard of Review*

" 'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citations.] '[G]enerally, from commencement to conclusion, the party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law.' [Citation.] If a defendant shows that one or more elements of a cause of action cannot be established or that there is a complete defense to that cause of action, the burden shifts to the plaintiff to show that a triable issue exists as to one or more material facts. [Citations.] If the trial court finds that no triable issue of fact exists, it then has the duty to determine the issue of law." (*Jimenez v. 24 Hour Fitness USA, Inc.* (2015) 237 Cal.App.4th 546, 553; see Code

15

Civ. Proc., § 437c.)  On appeal, we " 'review the trial court's decision de novo, liberally construing the evidence in support of the party opposing summary judgment and resolving doubts concerning the evidence in favor of that party.' " (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 705, quoting *State of California v. Allstate Ins. Co.* (2009) 45 Cal.4th 1008, 1017-1018.)

Summary adjudication works the same way as summary judgment, "except it acts on specific causes of action or affirmative defenses, rather than on the entire complaint." (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 464 (*Hartline*), citing Code Civ. Proc., § 437c, subd. (f).)  "A summary adjudication is properly granted only if a motion therefor completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (*Hartline*, at p. 464, citing Code Civ. Proc., § 437c, subd. (f)(1).)  "Motions for summary adjudication proceed in all procedural respects as a motion for summary judgment." (*Hartline*, at p. 464, citing Code Civ. Proc., § 437c, subd. (f)(2).)

" 'An order denying a motion for summary adjudication may be reviewed by way of a petition for writ of mandate.  [Citation.]  Where the trial court's denial of a motion for summary judgment will result in trial on nonactionable claims, a writ of mandate will issue.  [Citations.]  Likewise, a writ of mandate may issue to prevent trial of nonactionable claims after the erroneous denial of a motion for summary adjudication.  [¶]  Since a motion for summary judgment or summary adjudication "involves pure matters of law," we review a ruling on the motion de novo to determine whether the moving and opposing papers show a triable issue of material fact.  [Citations.]  Thus, the appellate court need not defer to the trial court's decision.  " 'We are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' "  [Citations.]' " (*CRST, Inc. v. Superior Court* (2017) 11 Cal.App.5th 1255, 1259-1260, quoting *Travelers Casualty & Surety Co. v. Superior Court* (1998) 63 Cal.App.4th 1440, 1450.)

16

## II

### *The Elder Abuse Act*

The Elder Abuse Act "affords certain protections to elders and dependent adults." (*Winn, supra*, 63 Cal.4th at p. 152.) "Section 15657 . . . provides heightened remedies to a plaintiff who can prove 'by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57,' and who can demonstrate that the defendant acted with 'recklessness, oppression, fraud, or malice in the commission of this abuse.' " (*Winn*, at p. 152.) Section 15610.57 defines "neglect," insofar as relevant here, as "[t]he negligent failure of any person *having the care or custody of an elder or a dependent adult* to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1), italics added; see *Winn*, at p. 152.)

## III

### *Substantial Caretaking or Custodial Relationship*

Defendants assert the trial court erred in denying their motion for summary adjudication because, in opposition, plaintiffs failed to raise a triable issue of fact as to whether defendants' nurses had a substantial caretaking or custodial relationship with decedent. Defendants' nurses provided decedent with in-home wound care six times over 16 days in July 2015 and four additional occasions over eight days in October 2015. According to defendants, it is undisputed that all their nurses did for decedent was to provide wound care, as opposed to general nursing for her other health issues. Moreover, defendants assert that their nurses taught Foster how to care for the wound. Defendants assert their nurses were not responsible for bathing, feeding, changing, or transporting decedent, and that decedent relied on Foster for those need of daily living.

In their return, plaintiffs emphasize "the undisputed evidence establishes that [decedent] was *completely dependent* on others for *all* her basic care needs. Her

granddaughter, Ms. Foster, visited three times a day to assist [decedent] with dressing, eating, medications, ambulation, toileting/changing of diapers, physician appointments and diabetes management." Defendants, meanwhile, contracted to provide "substantial wound care needs" for decedent because Foster had neither the time nor the training to satisfy this need.

The parties agree *Winn* is controlling. They disagree on the application of that case to these facts. Because we agree it is controlling, we discuss *Winn* at length.

In *Winn*, the decedent was treated by Dr. Csepanyi on an outpatient basis at the defendant's facilities. (*Winn, supra*, 63 Cal.4th at pp. 152-153.) She was subsequently treated by another physician, Dr. Lowe, who treated her for " 'painful onychomycosis,' a condition that may limit mobility and impair peripheral circulation." (*Id*. at p. 153.) Lowe noted impaired vascular flow in the decedent's lower legs and sent a copy of his report to Csepanyi. (*Ibid*.) The decedent's lower-extremity vascular symptoms worsened and Csepanyi diagnosed her with peripheral vascular disease. (*Ibid*.) Later, Lowe evaluated the decedent and found a reduced pulse in her extremities. He recommended a follow-up visit, but did not refer her to a vascular specialist. (*Ibid*.) Lowe subsequently treated the decedent for conditions consistent with tissue damage resulting from vascular insufficiency, prescribed medication, and recommended another follow-up. (*Ibid*.) However, again, Lowe did not refer the decedent to a specialist. (*Ibid*.) Dr. Csepanyi subsequently examined the decedent again and found she still suffered from peripheral vascular disease. (*Ibid*.) He saw her again a month later, but he did not perform a vascular examination at that time. (*Ibid*.) After sustaining a laceration on her foot, the decedent saw yet another physician, Dr. Lee, who prescribed antibiotics and instructed her to return for follow-up treatment. (*Ibid*.) When she returned, the wound had not healed. (*Ibid*.) The decedent subsequently saw Dr. Csepanyi on two occasions, during the second of which he diagnosed her with conditions all of which indicated cellular deterioration and tissue destruction from peripheral vascular ischemia. (*Ibid*.) The

decedent subsequently saw Lowe on four occasions. (*Ibid*.) He noted the decedent suffered from a condition caused by vascular compromise, but he did not refer her to a specialist. (*Ibid*.) During two of the visits, Lowe found he could not feel a pulse in the decedent's feet. (*Ibid*.) The decedent subsequently saw Csepanyi again, and he noted she had suffered abnormal weight loss, but he did not refer her to a specialist. (*Ibid*.) The day after her last visit with Csepanyi, the decedent was hospitalized "with symptoms consistent with ischemia and gangrene. She suffered from sepsis, or blood poisoning, which caused her foot to appear black, and doctors unsuccessfully attempted a revascularization procedure." (*Id*. at pp. 153-154.) Doctors amputated the decedent's right leg below the knee and later doctors performed an above-the-knee amputation. (*Id*. at p. 154.) Ultimately, the decedent was hospitalized for blood poisoning and died several days later. (*Ibid*.)

The plaintiffs in *Winn* asserted a cause of action against the defendants seeking to recover under the Elder Abuse Act. (*Winn, supra*, 63 Cal.4th at p. 154.) The trial court sustained the defendants' demurrer without leave to amend and the plaintiffs appealed. (*Ibid*.) A majority of the Court of Appeal reversed, concluding that the Elder Abuse Act "does not require the existence of a custodial relationship in order for the plaintiff to establish a cause of action for neglect." (*Ibid*., fn. omitted.) The majority further concluded "the 'statutory language simply does not support defendants' contention that only "care custodians" are liable for elder abuse.' " (*Id*. at pp. 154-155.)

Our high court granted review in *Winn* "to consider whether a claim of neglect under the Elder Abuse Act requires a caretaking or custodial relationship—where a person has assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn, supra*, 63 Cal.4th at p. 155.) The court determined that it does. (*Ibid*.) The Elder Abuse Act "does not apply unless the defendant health care provider had a substantial caretaking or custodial

19

relationship, involving ongoing responsibility for one or more basic needs, with the elder patient.  It is the nature of the elder or dependent adult's relationship with the defendant—not the defendant's professional standing—that makes the defendant potentially liable for neglect."  (*Id*. at p. 152.)

In construing section 15610.57, defining neglect and setting forth a nonexhaustive list of examples, our high court stated:  "Neglect includes the '[f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter.'  [Citation.]  It also includes the '[f]ailure to protect from health and safety hazards' [citation], and the '[f]ailure to prevent malnutrition or dehydration' [citation].  These examples add some context elucidating the statute's meaning—context that supports inferences about the sort of conduct the Legislature sought to address from individuals 'having the care or custody' of an elder.  What they each seem to contemplate is the existence of a robust caretaking or custodial relationship—that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance."  (*Winn, supra*, 63 Cal.4th at pp. 157-158.)

Particularly relevant here, our high court continued:  "The remaining example of neglect—the '[f]ailure to provide medical care for physical and mental health needs' [citation]—fits the pattern.  As with the other examples of neglect, the failure to provide medical care *assumes that the defendant is in a position to deprive an elder or a dependent adult of medical care*.  Section 15610.57, subdivision (b)(2)'s use of the word 'provide' also suggests a care provider's assumption of a substantial caretaking or custodial role, as it speaks to a determination made by one with control over an elder whether to *initiate* medical care at all.  Read in tandem, section 15610.57, subdivisions (a)(1) and (b)(2) support a straightforward conclusion:  whether a determination that medical care should be provided is made by a health care provider or not, it is the defendant's relationship with an elder or a dependent adult—not the defendant's

20

professional standing or expertise—that makes the defendant potentially liable for neglect." (*Winn, supra*, 63 Cal.4th at p. 158, first italics added.)

Our high court concluded that, "[u]ltimately, the focus of the statutory language is on the nature and substance of the relationship between an individual and an elder or a dependent adult.  This focus supports the conclusion that the distinctive relationship contemplated by the [Elder Abuse] Act entails more than casual or limited interactions." (*Winn, supra*, 63 Cal.4th at p. 158.)

Distinguishing between the Elder Abuse Act and professional negligence, our high court stated:  "What seems beyond doubt is that the Legislature enacted a scheme distinguishing between—and decidedly not lumping together—claims of professional negligence and neglect.  [Citations.]  The [Elder Abuse] Act seems premised on the idea that *certain situations place elders and dependent adults at heightened risk of harm*, and heightened remedies relative to conventional tort remedies are appropriate as a consequence.  [Citation.]  Blurring the distinction between neglect under the [Elder Abuse] Act and conduct actionable under ordinary tort remedies—even in the absence of a care or custody relationship—risks undermining the [Elder Abuse] Act's central premise." (*Winn, supra*, 63 Cal.4th at pp. 159-160, italics added.)

Our high court continued, stating that the "qualification on the types of conduct that trigger heightened remedies supports the conclusion that *the Legislature explicitly targeted heightened remedies to protect particularly vulnerable and reliant elders and dependent adults*.  Indeed, the limited availability of heightened remedies is indicative of a determination that *individuals responsible for attending to the basic needs of elders and dependent adults that are unable to care for themselves should be subject to greater liability where those caretakers or custodians act with recklessness, oppression, fraud, or malice*.  [Citation.]  The statutory scheme further persuades us that the concept of neglect—though broad enough to encompass settings beyond residential care facilities— is not intended to apply to any conceivable negligent conduct that might adversely impact

21

an elder or dependent adult. Instead, neglect requires a caretaking or custodial relationship that arises where an elder or dependent adult depends on another for the provision of some or all of his or her fundamental needs." (*Winn, supra*, 63 Cal.4th at p. 160, italics added.)

Our high court concluded in *Winn*: "Beyond the assertion that defendants treated [the decedent] at outpatient 'clinics' operated by defendants, plaintiffs offer no other explanation for why defendants' intermittent, outpatient medical treatment forged a caretaking or custodial relationship between [the decedent] and defendants. No allegations in the complaint support an inference that [the decedent] relied on defendants *in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers*. Accordingly, we hold that defendants lacked the needed caretaking or custodial relationship with the decedent." (*Winn, supra*, 63 Cal.4th at p. 165, italics added.) Our high court further concluded: "plaintiffs rely solely on defendants' allegedly substandard provision of medical treatment, on an outpatient basis, to an elder. But without more, such an allegation does not support the conclusion that neglect occurred under the Elder Abuse Act. To elide the distinction between neglect under the Act and objectionable conduct triggering conventional tort remedies—even in the absence of a care or custody relationship—risks undermining the Act's central premise." (*Ibid.*)

The factual circumstances in *Winn* are somewhat different than those presented here. *Winn* involved the outpatient treatment of the decedent by physicians and those physicians' failure to refer her to a vascular specialist. Here, plaintiffs' contentions relate to defendants, who were providing decedent with in-home nursing care to tend to her wound, their alleged deliberate disregard for decedent's deteriorating condition, and their failure to provide her with greater care and/or to transfer her to Oroville Hospital for greater levels of care.

22

Defendants agreed to provide in-home nursing services for decedent.  They were to provide such services "3-4 days and prn," or as needed.  Decedent consented "to receive whatever home health treatment, procedure, and/or services that are deemed necessary by the attending physician in consultation with the staff of Golden Valley Home Health."

Defendants provided decedent with in-home wound care on six occasions in July 2015 and four additional occasions in October 2015.  We agree with plaintiffs that the mere number of occasions on which a defendant furnishes medical care is not dispositive to the question whether a substantial caretaking or custodial relationship required under the Elder Abuse Act has arisen.

A distinction between this case and *Winn* is where the services at issue were provided.  In *Winn*, the decedent saw defendants' physicians on an outpatient basis. (*Winn, supra*, 63 Cal.4th at p. 152.)  Here, defendants' nurses provided decedent with in-home wound care on a number of occasions.  Our high court did state in *Winn* that "[c]ertain in-home health care relationships . . . may satisfy the caretaking or custodial relationship requirement set forth under the [Elder Abuse] Act."  (*Id*. at p. 158.) However, while we may consider this as a factor, it is certainly not dispositive.

Meanwhile, it is undisputed that Foster served as caretaker for decedent and fulfilled a number of decedent's basic needs, including dressing decedent, getting food for decedent, administering medications to decedent, helping decedent ambulate in her home, assisting decedent with toileting, changing decedent's diapers, taking decedent to her doctor appointments, and helping to manage decedent's diabetes.  Foster visited decedent to perform her caretaking functions three times daily.  Plaintiffs do not dispute the foregoing, but assert Foster was improperly trained to be primarily responsible for decedent's wound care.  We assume, for purposes of this appeal, that defendants were primarily responsible for decedent's wound care and that Foster neither was nor should have been primarily responsible for decedent's wound care.

It is plain Foster had a caretaking or custodial relationship with decedent based on, among other things, the fact that Foster had assumed significant responsibility for attending to many of decedent's basic needs which a competent and able-bodied adult would ordinarily be capable of managing without assistance.  (See *Winn, supra*, 63 Cal.4th at p. 155.)

We agree with plaintiffs that, to be deemed a caretaker or custodian for present purposes, *Winn* does not require that a defendant assume responsibility for *all* of the elder's needs.  As our high court stated in *Winn*, what three statutory examples of neglect "each seem to contemplate is the existence of a robust caretaking or custodial relationship—that is, *a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.*"  (*Winn, supra*, 63 Cal.4th at p. 158, italics added.)

It must be determined, on a case-by-case basis, whether the specific responsibilities assumed by a defendant were sufficient to give rise to a substantial caretaking or custodial relationship.  The fact that Foster provided for a large number of decedent's basic needs does not, in itself, serve to insulate defendants from liability under the Elder Abuse Act if the services they provided were sufficient to give rise to a substantial caretaking or custodial relationship.  Nowhere in *Winn* is there any suggestion that only one person or entity can be in a qualifying caretaking or custodial relationship with an elder or dependent adult at a given time, although such will often be the case.  In other words, while Foster had a caretaking relationship with decedent, that in itself does not establish that defendants did not *also* have such a relationship with decedent.

Based on our review of the undisputed facts, we conclude defendants' provision of wound care to decedent did not give rise to the substantial caretaking or custodial relationship required to establish neglect under the Elder Abuse Act.

24

Defendants providing in-home nursing for wound care did not establish they had "assumed significant responsibility for attending to one or more *of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance*." (*Winn, supra*, 63 Cal.4th at pp. 155, 158, italics added.) Wound care such as that at issue here is not a "basic need" of the type an able-bodied and fully competent adult would ordinarily be capable of managing on his or her own. Indeed, plaintiffs themselves assert Foster, presumably an able-bodied and fully competent adult, did not have the training to properly attend to decedent's wound care needs, and they acknowledged in their separate statement in opposition to defendants' motion that she "was not qualified to provide such nursing services." Unlike a basic need an able-bodied and fully competent adult would be capable of managing without assistance, such as eating, taking medicine, or using the restroom, decedent's wound care required competent professional medical attention. Like *Winn*, we conclude the allegations and evidence here do not "support an inference that [decedent] relied on defendants *in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers*." (*Winn, supra*, 63 Cal.4th at p. 165, italics added.) We conclude the relationship at issue here is not the type of arrangement the Legislature was addressing in the Elder Abuse Act.

In enacting the Elder Abuse Act, "[t]he Legislature recognized 'that most elders … who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and other poor health that place them in a *dependent and vulnerable position*.' " (*Winn, supra*, 63 Cal.4th at p. 162, quoting § 15600, subd. (d).) The Legislature "expressed concern for those who are vulnerable and dependent on others for their most basic needs." (*Winn*, at p. 162.)

To be clear, decedent *was* vulnerable and dependent on others for her most basic needs. Decedent's most basic needs were met by Foster. And, again, the fact that Foster

undertook to provide for decedent's basic needs does not mean defendants could not be found to have a caretaking or custodial relationship with decedent.

But in assessing defendants' potential liability under the Elder Abuse Act, our focus must be on the specific relationship developed between defendants and decedent. Defendants' provision of in-home nursing for wound care on a number of occasions is more analogous to the outpatient visits the decedent had with physicians in *Winn* than it is the situation where a defendant has "assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn, supra*, 63 Cal.4th at pp. 155, 158.) That decedent was dependent and vulnerable as a general matter does not mean that anyone who entered into her orbit and provided her with a service would have entered into a caretaking or custodial relationship with her.

Plaintiffs assert the facts here are nothing like those in *Winn*, "in which the . . . physicians failed to refer the patient to a specialist." We have discussed the facts of *Winn*, *ante*. Those physicians obviously did fail to refer the decedent to a specialist. However, they were far more involved in her care than plaintiffs' characterization. Indeed, for what it is worth, combined, the physicians discussed in *Winn* treated the decedent on more occasions than defendants attended to decedent here. (*Winn, supra*, 63 Cal.4th at pp. 152-154.)

The provision of medical care will not always give rise to the type of caretaking or custodial relationship required to establish neglect under the Elder Abuse Act. As our high court stated in *Winn*, "nothing in the legislative history suggests that the Legislature intended the [Elder Abuse] Act to apply *whenever* a doctor treats any elderly patient. Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme." (*Winn, supra*, 63 Cal.4th at p. 163.)

Additionally, the statutory example of neglect most relevant here is the "[f]ailure to provide medical care for physical and mental health needs." (§ 15610.57, subd.

26

(b)(2).) Our high court stated: the failure to provide medical care "assumes that the defendant is in a position to deprive an elder or a dependent adult of medical care. Section 15610.57, subdivision (b)(2)'s use of the word 'provide' also suggests a care provider's assumption of a substantial caretaking or custodial role, as it speaks to a determination made by one with control over an elder whether to *initiate* medical care at all." (*Winn, supra*, 63 Cal.4th at p. 158.) The evidence here demonstrates defendants *were* providing medical care. In light of our determination that defendants did not have a caretaking or custodial relationship with decedent, defendants' alleged failure to provide *adequate* care is relevant to a professional negligence claim rather than a claim under the Elder Abuse Act. Additionally, there is nothing in the record suggesting defendants somehow impeded or interfered with decedent seeking medical care elsewhere.

Plaintiffs rely on the written contract in asserting that they "presented abundant evidence that [defendants] assumed a significant measure of responsibility for attending to [decedent's] needs." Plaintiffs assert that, in the contract, defendants agreed they would provide " 'whatever home health treatment, procedure, and/or services that are deemed necessary by the attending physician in consultation with the staff of' " defendants. (Underlining omitted.) In the language plaintiffs raise, it was in fact, decedent consenting to treatment rather than defendants promising to provide it.

Plaintiffs also point out that "care custodian" as defined in section 15610.17 includes "[t]wenty-four-hour health facilities" as defined in, inter alia, section 1250 of the Health and Safety Code. (§ 15610.17, subd. (a).) That section includes skilled nursing facilities in its definitions of health facilities. (Health & Saf. Code, § 1250, subd. (c).) Further, a " 'Home Health Agency' means a private or public organization . . . which provides, or arranges for the provision of, *skilled nursing services*, to persons in their temporary or permanent place of residence." (Cal. Code Regs., tit. 22, § 74600, italics added.)

27

While plaintiffs concede that *Winn* made plain that "care or custody is not established as a matter of law merely because a facility or agency is defined as a 'care custodian' under section 15610.17," the determination whether a caretaking or custodial relationship exists in this context "should nonetheless factor in the fundamental nature of home health care, which is to provide skilled nursing services to individuals in their homes." Indeed, in *Winn*, our high court stated: "What plaintiffs erroneously assume is that the [Elder Abuse] Act's definition of care custodian in section 15610.17 will, as a matter of law, always satisfy the particular caretaking or custodial relationship required to show neglect under section 15610.57. While it may be the case that many of the ' "[c]are custodian[s]" ' defined under section 15610.17 could have 'the care or custody of' an elder or a dependent adult as required under section 15610.57, subdivision (a)(1), *plainly the statute requires a separate analysis to determine whether such a relationship exists*. Neither the text of section 15610.17 nor anything else in the statute supports plaintiffs' argument that the presence of such a relationship may be assumed whenever the definition of 'care custodian' is met." (*Winn, supra*, 63 Cal.4th at p. 164, italics added.) We have concluded in our "separate analysis" defendants did not have the requisite substantial caretaking or custodial relationship with decedent. "[F]actor[ing] in the fundamental nature of home health care, which is to provide skilled nursing services to individuals in their homes" does not change our conclusion.

Plaintiffs assert it was "entirely improper" for defendants to "attempt to delegate [decedent's] wound care to her family." According to plaintiffs, Foster did not have the time or expertise to attend to decedent's wound care, and her expectation was that defendants would provide all wound care while Foster would attend to decedent's other, basic needs.

We would note that defendants appear not to have delegated their responsibility for wound care to Foster. Rather, they trained her on wound care to assist decedent when they were not on site. Defendants were not to be at decedent's home around the clock.

28

Training Foster to care for decedent's wounds when none of defendants' nurses were present would, if anything, *enhance* the level of decedent's care, not diminish it. We do not believe the fact that defendants trained Foster on caring for decedent's wounds amounts to defendants " '[f]ail[ing] to provide medical care for physical and mental health needs' " or depriving decedent of medical care. (*Winn, supra*, 63 Cal.4th at p. 158, quoting § 15610.57, subd. (b)(2).)

Since our high court decided *Winn*, there has been but one published Court of Appeal case citing *Winn* and analyzing, in any depth, the existence of a caretaking or custodial relationship requirement.

In *Stewart, supra*, 16 Cal.App.5th 87, the appellate court stated: "it appears Carter depended on St. Mary to meet his basic needs in ways that establish the type of custodial relationship described by the *Winn* court. In fact, we note Carter's admission to an acute care facility such as St. Mary, standing alone, would have been sufficient to make him a 'dependent adult' who would be entitled to the [Elder Abuse] Act's protections even if he had not also qualified as an 'elder' by virtue of his age. [Citations.] The facts of this case further support our conclusion, as Carter was experiencing confusion upon admission, and a doctor's note prepared a week after admission describes him as a 'very poor historian' who could not provide a coherent history and tended only to mumble and grunt. The record also shows that Carter at times needed medical assistance, including a G-tube, to consume adequate calories. Finally, St. Mary readily admits Dr. Denton told it that Carter's health was poor enough that he required a pacemaker on an emergency basis. For these reasons, we conclude St. Mary had ' "care or custody of" ' Carter and therefore was obligated ' "to exercise that degree of care that a reasonable person in a like position would exercise." [Citation.]' " (*Id*. at p. 102.)

The defendants in *Stewart* asserted the appellate court should "make a care and custody determination as to the specific circumstances surrounding" a meeting of the hospital's ethics committee in connection with the decision regarding consent to

29

pacemaker surgery as opposed to making the determination based on the relationship between Carter and the hospital as a whole. (*Stewart, supra*, 16 Cal.App.5th at p. 102.) "The ethics committee meeting, in St. Mary's view, was not about the provision of medical care but instead involved only the interpretation of [the] power of attorney" that had been executed by the patient. (*Id*. at pp. 102-103.) The *Stewart* court stated: "We do not see how *Winn* supports the suggestion that 'when [St. Mary] interpreted [Carter's] Power of Attorney, [it was] no longer acting as care custodian[], but rather as [a] healthcare provider[] focused on the undertaking of medical services.' In fact, in our view, *Winn* supports the opposite conclusion. Here, St. Mary accepted Carter as a patient with knowledge of his 'confus[ed]' state, which left him a 'poor historian,' and its records show Carter at times required assistance with feeding. Moreover, the ethics committee authorized the performance of surgery on Carter's behalf on the assumption that he lacked the ability to consent. In our view, St. Mary had accepted responsibility for assisting Carter with acts for which '[o]ne would not normally expect an able-bodied and fully competent adult to depend on another.' [Citation.] [¶] We see no reason why the facts that the decision to allow Dr. Denton and Dr. Ashtiani to sign the consent to the pacemaker surgery in Carter's stead was made in a setting that was more like a conference room than an examination room, or that St. Mary sought advice from counsel rather than from a doctor other than Dr. Denton, must mean that the ethics committee meeting served a noncustodial function. After all, 'it is the defendant's relationship with an elder or a dependent adult—not the defendant's professional standing or expertise— that makes the defendant potentially liable for neglect.' [Citation.] For these reasons, *Winn* better supports the conclusion that the majority of St. Mary's interactions with decedent were custodial. *St. Mary has cited no authority allowing or even encouraging a court to assess care and custody status on a task-by-task basis, and the Winn court's focus on the extent of dependence by a patient on a health care provider rather than on*

30

*the nature of the particular activities that comprised the patient-provider relationship counsels against adopting such an approach*." (*Id*. at pp. 103-104, italics added.)

In *Stewart*, the defendants, in effect, attempted to remove themselves from the reach of the Elder Abuse Act by parsing out the events involved in the ethics committee meeting from the rest of the care they furnished to the decedent and the resulting relationship. The appellate court concluded in the italicized language that there was no authority supporting such parsing on a task-by-task basis and that *Winn* counseled against such an approach. (*Stewart, supra*, 16 Cal.App.5th at p. 104.)

Plaintiffs' framing of *Stewart* does not present the complete picture of that case. In discussing *Stewart*, plaintiffs largely ignore the factors which established St. Mary did have a caretaking or custodial relationship with Carter. They also assert "defendants are effectively urging this court to adopt the reasoning rejected in *Stewart*." We disagree. Here, wound care is the *only* matter with which defendants were tasked. They certainly did not undertake any of the other forms of caretaking as did the defendants in *Stewart*. And we have concluded that the provision of wound care under the circumstances of this case did not give rise to the requisite substantial caretaking or custodial relationship. To the extent plaintiffs assert defendants cannot parse out the caretaking decedent received from defendants *and Foster* on a task-by-task basis, this misses the mark. This would not be parsing on a task-by-task basis as was disapproved in *Stewart*. Rather it is distinguishing between acts committed by defendants and acts committed by others, an entirely necessary consideration. In this regard, we note plaintiffs' repeated emphasis on decedent's dependence on others for help with her basic needs. Decedent's condition is certainly a relevant consideration. But her reliance on individuals other than defendants for help with her basic needs, specifically Foster, has limited relevance to the nature of her relationship with defendants and the role they played in her care.

In our view, on these undisputed facts, finding the existence of a substantial or robust caretaking or custodial relationship between defendants and decedent would

31

"[b]lur[] the distinction between neglect under the [Elder Abuse] Act and conduct actionable under ordinary tort remedies," and would "risk[] undermining the Act's central premise." (*Winn, supra*, 63 Cal.4th at p. 160.)

Under the guidance of *Winn*, we conclude that, in support of their motion for summary adjudication, defendants eliminated all triable issues of fact as to whether they had the requisite substantial caretaking or custodial relationship with decedent to support plaintiffs' Elder Abuse Act cause of action. In opposition, plaintiffs failed to raise a triable issue of material fact. Accordingly, the trial court should have granted defendants summary adjudication on the Elder Abuse Act cause of action. We shall issue a peremptory writ of mandate consistent with this conclusion.

IV

*Reckless Conduct*

Defendants assert that trial court erred in denying their motion for summary adjudication because plaintiffs failed to demonstrate that a reasonable jury could find, by clear and convincing evidence, that it was guilty of forms of abuse or neglect performed with recklessness. However, defendants further state that, if we conclude that there was no substantial caretaking or custodial relationship, we "need not reach the remaining issues in this petition." We agree. Accordingly, we need not address defendants' contentions concerning whether their conduct rose to the level of recklessness.

DISPOSITION

Let a peremptory writ of mandate issue directing the respondent Butte County Superior Court to vacate the order of August 28, 2019, in the superior court case No. 16CV03116, entitled Ambrose v. Oroville Hospital, denying that branch of defendants' motion which was for summary adjudication on plaintiffs' Elder Abuse Act cause of

action, and enter a new order granting that branch of defendants' motion.  Defendants shall recover their costs in this proceeding.  (Cal. Rules of Court, rule 8.493.)


                                              _____

                                              HULL, J.


We concur:


_____

RAYE, P.J.


_____

MURRAY, J.